UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------- X
                                                                :
DIEGO AZURDIA and MARCELLA CHIBBARO,                            :
                                                                :          18-cv-04189-ARR-PK
                              Plaintiffs,                        :
                                                                :
        -against-                                               :
                                                                :          OPINION & ORDER
THE  CITY  OF  NEW  YORK,  Sergeant                             :
MICHAEL SINNER, Police Officer BARTY                            :
TORIBIO, Police Officer JEAN GERMAIN,                          :
Lieutenant "RICHARD ROE," and JOHN and                         :
JANE DOES 1, 2, 3, etc.,                                        :
                                                                :
                              Defendants.                        :
--------------------------------------------------------------- X

ROSS, United States District Judge:

       Plaintiffs, Diego Azurdia and Marcella Chibbaro, bring this civil rights action under 42

U.S.C. § 1983 and New York state law against the City of New York ("the City") and several of

its police officers (collectively, "defendants"). The lawsuit arises out of an April 23, 2017 incident

in which Jean Germain, an officer employed by the New York Police Department ("NYPD"), shot

and killed plaintiffs' pet dog, Lola. At the time of the shooting, Germain and another NYPD

officer, Barty Toribio, were investigating the report of a taxi driver who alleged that Azurdia had

failed to pay him for a ride he had recently taken from the Bronx to his home in Brooklyn. After

the shooting, Azurdia was arrested for theft of services in violation of New York Penal Law §

165.15, and he was subsequently processed at the 77th police precinct in Brooklyn. Though Lola

was taken to the Blue Pearl veterinary hospital for emergency medical treatment, the doctors were

unable to resuscitate her, and she succumbed to her injuries at the hospital.

       Plaintiffs filed this lawsuit on July 23, 2018. They assert several claims for the injuries they

suffered as a result of Lola's fatal shooting and Azurdia's arrest and prosecution. The City has

moved to dismiss all of plaintiffs' claims pursuant to Federal Rule of Civil Procedure 12(b)(6). For the following reasons, the City's motion is granted in part and denied in part.

## FACTUAL AND PROCEDURAL BACKGROUND

At approximately 3:15 a.m. on April 23, 2017, Diego Azurdia took a taxi from the Bronx to his home in Brooklyn. *See* Second Am. Compl. ¶ 16, ECF No. 17 ("SAC").[1] When the car arrived at its destination, Azurdia realized that he did not have money to pay the driver for the ride. *Id.* ¶ 17. In response, he and the driver arranged a deal: Azurdia agreed to collect the necessary fare from his apartment and, in exchange, the driver would hold Azurdia's New York City Identification Card ("ID" or "ID card") as collateral until he returned with the payment. *Id.* ¶ 18. Azurdia entered his apartment, but as he began to collect the money he owed, he inadvertently "dozed off." *Id.* ¶¶ 20, 22.

After approximately twenty minutes had passed, the taxi driver grew concerned. *Id.* ¶¶ 23–24. He called 911 and explained his arrangement with Azurdia. *Id.* He told the operator that Azurdia was supposed to "return with [the] money in five minutes," but, now that twenty minutes had passed, he was becoming worried that "something might be wrong." *Id.* ¶ 24. He also told the operator that Azurdia's ID card "was valid and accurately listed his building and apartment numbers." *Id.* ¶ 25. Soon after the driver's call, two NYPD officers arrived at Azurdia's apartment building and began knocking on his door. *Id.* ¶¶ 26–27, 30. The sound of the knocking awakened Azurdia, and he walked to the door to answer it. *Id.* ¶¶ 26, 28. The officers, Barty Toribio and Jean

---

[1] For the purpose of this motion, I assume the truth of the factual allegations in plaintiffs' second amended complaint. *See Lundy v. Catholic Health Sys. of Long Island, Inc.*, 711 F.3d 106, 113 (2d Cir. 2013). In deciding this motion, defendants ask that I draw the relevant facts from a host of additional documents outside of the pleadings that defendants have attached to their motion to dismiss. *See* Defs.' Br. 10–12, ECF No. 26; *see also* Aribakan Decl., Exs. B–G, ECF Nos. 23-2–23-7. As I explain below, I conclude that none of these documents are properly considered at this stage of the litigation. Accordingly, the facts in this summary are drawn exclusively from the plaintiffs' factual allegations.

Germain, did not identify themselves, and Azurdia thought that the person at the door might have been a friend who had recently been staying with Azurdia and his wife. *Id.* ¶¶ 27–28.

Lola, Azurdia's pet dog, followed Azurdia as he walked to the door; once he reached the door, she stood beside him. *Id.* ¶ 29. When Azurdia opened the door, he saw the two officers standing on the other side. *Id.* ¶ 30. Lola "did not bark or lunge" at the officers, and she "did not act in an aggressive or threatening manner or . . . in a manner that could reasonably have been believed to be aggressive or threatening." *Id.* ¶¶ 31–32. Without any provocation, Officer Germain "fired his gun at Lola several times," striking her and causing her to "bleed[] profusely" and "whimper[]." *Id.* ¶¶ 33, 35, 37.

The sound of the shots awakened Chibarro, who had been sleeping at the time that the officers arrived. *Id.* ¶¶ 21, 39. She "ran from her bedroom to the apartment entrance," and "saw her husband lying on the ground and blood on the floor." *Id.* ¶¶ 39–40. When she asked the officers if Lola had been shot, one of them yelled, "'Hold it! . . . Keep that thing away from me!'" *Id.* ¶¶ 42, 44. Though Chibbaro begged the officers to allow her to take Lola to a hospital, they ignored her requests. *Id.* ¶¶ 46–48. At some point before the shooting, the officers had acquired Azurdia's ID card, which he had previously given to the taxi driver to hold while he went upstairs to get money. *See id.* ¶¶ 18–19, 25, 49. Plaintiffs do not allege how the officers came into possession of the ID, though it is reasonable to infer that the officers spoke with the driver and obtained the card when they arrived at Azurdia's apartment building. *See id*; *see also* Pls.' Pre-motion Letter Resp. 3, ECF No. 15 (arguing that the officers learned additional information about Azurdia's agreement with the driver before they knocked on Azurdia's door). The officers showed the ID to Chibbaro, whose name and phone number were listed on the card as Azurdia's emergency contact. *Id.* ¶¶ 19,

49. After Chibbaro confirmed that she was Azurdia's wife, one of the officers explained to her that "Mr. Azurdia had not paid for a taxi." *Id.* ¶¶ 50–51.

Several more people arrived on the scene, including the defendant officers' supervisors, Lieutenant Roe and Sergeant Sinner, and neighbors from plaintiffs' apartment building who had stopped by to see what was going on in plaintiffs' apartment. *Id.* ¶¶ 52–54. Eventually, the officers granted Chibbaro's requests to take Lola to a veterinarian, and Chibbaro and Lola were escorted out of the building by two officers who had recently arrived at the apartment building from the 78th precinct. *Id.* ¶¶ 55, 57–58. As she left the building, Chibbaro noticed a taxi "which she believed was the taxi that had driven Mr. Azurdia home." *Id.* ¶ 59. She asked numerous officers multiple times if she could pay the driver the money Azurdia owed, but she was told "to do that later." *Id.* ¶¶ 59–63.[2] Plaintiffs also allege that, around the same time, the taxi driver repeatedly requested that the officers allow Azurdia to pay him the owed taxi fare, but the officers told him that they "could not do anything about the outstanding taxi fare" and that they "could not 'force' Mr. Azurdia to give him money." *Id.* ¶¶ 64–66. The officers took Chibbaro and Lola to the Blue Pearl veterinary hospital, where doctors "tried to stabilize Lola and assess her injuries." *Id.* ¶¶ 67, 77. During the course of an operation, the doctors discovered that Lola "had been shot three times: one bullet went through her snout, another bullet had gone into her torso and was lodged in her lung, and another bullet had grazed one of her legs." *Id.* ¶ 78. As the doctors worked to remove the bullet from her lung, Lola's heart stopped beating and she was pronounced dead. *Id.* ¶¶ 79–81.

---

[2] The complaint does not clearly identify which officers Chibarro asked for permission to pay the driver, referring instead to the relevant officers as "the detectives," and "other police officers." SAC ¶¶ 60, 62. Plaintiffs do not allege, however, that the officers who later arrested Azurdia, including Officers Germain and Toribio, were present at the time that Chibarro made these requests. Instead, according to plaintiffs, the arresting officers were either detaining Azurdia in a stairwell at the time that Chibarro was on her way to the veterinary hospital, or they were in the process of conferring with their supervisors to develop a narrative that would "portray [Azurdia] as a criminal and . . . cover up [Officer] Germain's misconduct in unjustifiably shooting Lola." *Id.* ¶¶ 68–71.

Meanwhile, Azurdia was handcuffed and brought to the 77th precinct, where he was processed and charged with "theft of services for tampering with a fare meter."[3] *Id.* ¶¶ 75–76, 82–83. Plaintiffs allege that, before the arrest, the officers conspired to develop a plan to justify the shooting in an effort to protect themselves and the NYPD. *Id.* ¶¶ 69–74. Outside of Azurdia's presence, Officers Germain and Toribio, Lieutenant Roe, and Sergeant Sinner agreed to charge Azurdia with theft of services. ¶¶ 69–71. Plaintiffs also allege, "upon information and belief," that the defendants "agreed to present a false narrative to justify" the fatal shooting of Lola. *Id.* ¶ 73. According to that fabricated story, the officers "heard a dog aggressively barking and growling" as they knocked on the apartment door, and they gave several commands for the dog to be restrained. *Id.* ¶ 74. After approximately two minutes of knocking and "repeatedly giving commands to restrain the dog, the apartment door suddenly opened, and Lola aggressively charged towards" Officer Germain, causing him to "unholster[] his firearm" and "fire[] five rounds at Lola." *Id.* Plaintiffs maintain that this story does not represent the truth, but was instead strategically crafted by defendants with the goal of avoiding punitive discipline and "bad publicity" for the police department. *Id.* ¶¶ 70–74.

After Azurdia's arrest, Officer Toribio spoke with the District Attorney's office, and he repeated the "false narrative" that he had developed with the other defendants about the events leading up to Azurdia's arrest and Lola's shooting. *Id.* ¶ 94. "The accusatory instrument charging Mr. Azurdia with theft of services," which was drafted after Officer Toribio's meeting with the prosecutors, included the allegation that Azurdia "had 'refused to pay' his taxi fare." *Id.* ¶ 95.

---

[3] As I discuss below, *see* Discussion pt. III, the defendant officers had no information that would have suggested that Azurdia "tamper[ed] with a fare meter." However, this fact does not defeat their motion to dismiss the false arrest claim, as they need only demonstrate that they had either probable cause or arguable probable cause to arrest the plaintiff for any crime—not necessarily the charged crime. *See, e.g.*, *Jaegly v. Couch*, 439 F.3d 149, 154 (2d Cir. 2006).

Eventually, the charges against Azurdia were dismissed after he accepted an adjournment in contemplation of dismissal pursuant to New York Criminal Procedure Law § 170.55. *Id.* ¶ 96.

Plaintiffs filed this lawsuit on July 23, 2018, *see* Compl., ECF No. 1, and subsequently amended the complaint twice—first on September 5, 2018, *see* Am. Compl., ECF No. 5, and again on January 7, 2019, after I held a pre-motion conference with the parties to discuss defendants' intention to file a motion to dismiss plaintiffs' claims, *see* SAC; *see also* Minute Entry, ECF No. 16. Plaintiffs' second amended complaint argues that defendants' actions violated plaintiffs' Fourth Amendment right to be free from unreasonable seizures, their Fourth Amendment right to be free from arrest without probable cause, and their Fourteenth Amendment right to a fair trial. *See* SAC ¶¶ 100–124. Plaintiffs also assert the following state-law claims: false arrest, conversion, negligence, *respondeat superior*, and violations of their rights to due process of law and freedom from unreasonable seizure under the New York State Constitution. *Id.* ¶¶ 133–151.[4] The instant motion was served on January 29, 2019, *see* Defs.' Br., ECF No. 26, and it was fully briefed on February 14, 2019, *see* Defs.' Reply, ECF No. 25.

## STANDARD OF REVIEW

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint "must contain sufficient factual matter . . . to state a claim to relief that is plausible on its face." *County of Erie v. Colgan Air, Inc.*, 711 F.3d 147, 149 (2d Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Though a plaintiff need not include "detailed factual allegations" in the complaint, "[t]hreadbare recitals of the elements of a cause of action, supported by mere

---

[4] Additionally, plaintiffs' second amended complaint asserts supervisory liability claims under 42 U.S.C. § 1983 against Lieutenant Roe and Sergeant Sinner. *See* SAC ¶¶ 125–132. In their opposition to defendants' motion to dismiss, however, plaintiffs informed the court that they intend to withdraw those claims. *See* Pls.' Opp'n 16, ECF No. 24. Those claims are accordingly dismissed, and Lieutenant Roe and Sergeant Sinner are dismissed from the case.

conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). In considering a motion to dismiss, the court must construe a complaint liberally, "accepting all factual allegations . . . as true, and drawing all reasonable inferences in the plaintiff's favor." *Lundy v. Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106, 113 (2d Cir. 2013) (quoting *Holmes v. Grubman*, 568 F.3d 329, 335 (2d Cir. 2009)). However, the court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). The factual allegations contained in the complaint "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

"Generally, consideration of a motion to dismiss under Rule 12(b)(6) is limited to consideration of the complaint itself." *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006). In appropriate circumstances, however, district courts may also consider a limited set of extraneous documents, including those that are "incorporated by reference in the complaint" or deemed "integral" to the complaint. *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010). The court may also rely upon "matters of which judicial notice may be taken" pursuant to Federal Rule of Evidence 201(b), which encompasses facts that are "not subject to reasonable dispute in that [they are] either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned." *Davis v. Cotov*, 214 F. Supp. 2d 310, 315 (E.D.N.Y. 2002) (quoting Fed. R. Evid. 201(b)). Before these documents can be considered, their authenticity must be assured, *id.*, and it must be clear to the court "that there exist no material disputed issues of fact regarding the relevance of the document." *Faulkner*, 463 F.3d at 134. Additionally, the "plaintiff's *reliance* on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the

court's consideration of a document on a dismissal motion." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (emphasis in original).

In urging the court to consider a 117-page book of extraneous documents, defendants appear to disregard these rules, ignoring the well-established limitations that exist on a motion to dismiss. *See Crown Heights Shomrin Volunteer Safety Patrol, Inc. v. City of New York*, No. 11-CV-329 (KAM), 2014 WL 4804869, at *1 (E.D.N.Y. Sept. 25, 2014) ("[T]here is a limited category of documents outside the complaint that may be taken into account on a motion to dismiss."). Specifically, defendants ask the court to take into consideration the following documents in deciding their motion: (1) transcripts of Chibbaro's and Azurdia's § 50-h hearings, which were held pursuant to New York's notice-of-claim provisions, (2) an NYPD Sprint/911 report, (3) an arrest report, and (4) memobook entries maintained by Officers Germain and Toribio that describe the night of Lola's shooting and Azurdia's arrest. *See* Aribakan Decl. Exs. B–G. Though defendants refer to courts that have considered similar documents in appropriate cases, *Faulkner* makes clear that this is a case-specific, contextual inquiry, dependent on the nature of the complaint's allegations and the relationship between the extraneous documents and the plaintiffs' claims. *See Faulkner*, 463 F.3d at 134 ("[B]efore materials outside the record may become the basis for a dismissal, several conditions must be met."). In this case, I find that none of these materials are properly considered at this stage of the litigation because there is no evidence that plaintiffs relied upon them in drafting their complaint, and, as to several of the documents, their accuracy and authenticity is explicitly called into question by the plaintiffs' allegations.[5]

---

[5] Defendants argue that plaintiffs' failure to present detailed arguments in opposition to the court's consideration of these documents amounts to a waiver of their right to challenge the use of the documents attached to defendants' motion. *See* Defs.' Reply 2. While it is true that plaintiffs' opposition fails to address the cases cited by defendants regarding the use of these documents, plaintiffs object broadly to the consideration of any documents outside plaintiffs' pleadings, *see* Pls.' Opp'n 7–8, and their pre-motion letter opposition included a more detailed argument on this issue, *see* Pls.' Pre-motion Letter Resp. 2–3.

With respect to the § 50-h hearing transcripts, I am unpersuaded by defendants' arguments that they are incorporated by reference into plaintiffs' complaint or otherwise integral to plaintiffs' allegations. *See* Defs.' Br. 10–11. Plaintiffs refer to the § 50-h hearings just once in their complaint: to reaffirm that they have complied with all of the conditions precedent to filing a lawsuit against the City. *See* SAC ¶ 7 ("At the request of the City of New York, on October 19, 2017, Plaintiffs submitted to a hearing pursuant to New York General Municipal Law Section 50-h."). This single reference fails to provide the court with a basis to conclude that plaintiffs relied upon this testimony in drafting their complaint—a necessary condition for the court to consider these documents. *See, e.g.*, *Doe v. City of New York*, No. 18-cv-680 (ARR) (JO), 2018 WL 3824133, at *5 (E.D.N.Y. Aug. 9, 2018) (citing cases); *see also Hazan v. City of New York*, No. 98 Civ. 1716(LAP), 1999 WL 493352, at *7 ("Although plaintiff does make brief reference to the hearing in the Complaint, reviewing the hearing transcript in and of itself seems an exercise that is better suited for a motion for summary judgment under Rule 56."). *But see Vessa v. City of White Plains*, No. 12-CV-6989 (ER), 2014 WL 1271230, at *4 n.11 (S.D.N.Y. Mar. 27, 2014) (considering a 50-h hearing transcript because the complaint "explicitly referenced" the fact that plaintiff submitted to a 50-h examination).[6] The fact that plaintiffs' current lawyer also represented them during their 50-h hearing, *see* Defs.' Br. 11, is likewise irrelevant to the central question of whether plaintiffs relied upon this testimony in framing their complaint.

---

Moreover, the court is appropriately constrained in deciding a motion to dismiss, and a plaintiff's failure to object to the use of documents outside of the pleadings does not authorize the court to consider documents that would otherwise be inappropriate at this stage of the litigation.

[6] As I explain below, *see infra* Discussion pts. I and II, the additional facts contained in plaintiffs' 50-h testimony would not alter my conclusion that plaintiffs state a claim for unreasonable seizure and conversion.

Defendants also argue that the court can rely upon the police officers' memobooks, which were written after Lola's shooting and Azurdia's arrest. This argument rests on even thinner grounds than defendants' arguments for consideration of the other documents, and it is in conflict with the clear limitations that pertain to the scope of the record on a motion to dismiss. The court cannot take judicial notice of these documents because the facts contained therein are directly contested by the plaintiffs; indeed, plaintiffs explicitly allege that the police officers fabricated the facts that they would later use to explain and justify Lola's shooting, *see* SAC ¶¶ 69–74. To consider these documents despite plaintiffs' serious allegations about their falsity would "amount to a premature determination that the arresting officers are more credible than [the] plaintiff[s]." *Williams v. City of New York*, No. 14-cv-5123 (NRB), 2015 WL 4461716, at *2 (S.D.N.Y. July 21, 2015).

The arrest report and NYPD Sprint/911 report present a closer call, but I nonetheless conclude that neither document is appropriate for review at this stage of the litigation.[7] As an initial matter, though plaintiff refers to a 911 call that was placed by the taxi driver twenty minutes after Azurdia entered his apartment, the Sprint/911 report itself is not "incorporated by reference" in the complaint, as there is no indication that plaintiff was either aware of this document's existence or used it when drafting the complaint. *See* SAC ¶¶ 23–25. Defendants argue that the court can take judicial notice of these documents as "public records," which would allow the court to "determine what statements [the public records] contained" without assuming their truth. *McLennon v. New York City*, No. 13-CV-128 (KAM), 2015 WL 1475819, at *4 (E.D.N.Y. Mar. 31, 2015) (alteration

---

[7] Even without considering these documents, I conclude that defendants had either probable cause or arguable probable cause to arrest Azurdia for theft of services. As I explain below, *see* infra Discussion pt. III, my conclusion is based on plaintiffs' allegations regarding the taxi driver's 911 phone call and the additional information the officers may have learned about Azurdia's arrangement with the driver when they recovered Azurdia's ID card before arriving at his apartment.

in original) (quoting *Monroe v. Myskowsky*, No. 12 CIV. 5513, 2014 WL 496872, at *1 n.3 (S.D.N.Y. Feb. 6, 2014)). Courts in this circuit occasionally consider similar documents as public records even where it is not necessarily clear that the plaintiffs relied upon them when preparing the complaint. *See e.g.*, *Dzwonczyk v. Syracuse Police Dep't*, 710 F. Supp. 2d 248, 256 (N.D.N.Y. 2008) (considering an arrest report); *Crown Heights*, 2014 WL 4804869, at *2 (considering NYPD Sprint reports). In this case, however, I find that the better course of action is to decline to consider these documents because their accuracy is challenged by the allegations in plaintiffs' complaint. *See Jurkowitsch v. City of New York*, No. 14 CV 6810 (PKC) (RML), 2015 WL 8489964, at *1 n.4 (declining to consider certain documents as "matters of public record" where their accuracy was not "beyond question" in the context of plaintiffs' claims). Plaintiffs' version of the driver's 911 call differs from the version that is summarized in shorthand in the NYPD/Sprint report, and on a motion to dismiss I am bound to accept the truth of plaintiffs' allegations. Furthermore, the arrest report seems to have been written after the events that form the basis of plaintiffs' claims, including the agreement that plaintiffs allege was made between the officers in an effort to justify the fatal shooting of Lola. The parties are not in agreement about the role, if any, that these documents actually played in establishing probable cause for Azurdia's arrest, so it is far from clear that there are no material disputes "regarding the relevance of the[se] document[s]" to the issues currently before the court. *Faulkner*, 463 F.3d at 134.

Accordingly, I limit my review on this motion to the facts contained in plaintiffs' second amended complaint.

## DISCUSSION

**I.      Defendants' motion to dismiss plaintiffs' Fourth Amendment unreasonable seizure claim is denied.**

Plaintiffs argue that Officer Germain's fatal shooting of Lola deprived them of their Fourth Amendment right "to be free from unreasonable seizure of their property." SAC ¶ 101. Defendants move to dismiss this claim, arguing that Officer Germain acted reasonably and with justification when he shot and killed Lola, or, alternatively, that Officer Germain is entitled to qualified immunity on this claim. *See* Defs.' Br. 12–15.[8]

In 2013, the Second Circuit joined several other circuits in concluding that "the unreasonable killing of a companion animal constitutes an unconstitutional 'seizure' of personal property under the Fourth Amendment." *Carroll v. County of Monroe*, 712 F.3d 649, 651 (2d Cir. 2013) (citing cases). Where, as here, a seizure is made without a warrant, it is "presumptively unreasonable." *Branson v. Price*, No. 13-cv-03090-REB-NYW, 2015 WL 5562174, at *5 (D. Colo. Sept. 21, 2015) (citing *United States v. Place*, 462 U.S. 696, 701 (1983)). A warrantless seizure may nevertheless be reasonable if "the totality of the circumstances justified [the] particular sort of . . . seizure." *Carroll*, 712 F.3d at 651 (alteration in original) (quoting *Tennessee v. Garner*, 471 U.S. 1, 9 (1985)). In conducting this analysis, courts utilize a balancing test, comparing "the

---

[8] In their moving brief, defendants advance a second argument for dismissal of plaintiffs' unreasonable seizure claim, arguing that Section 1983 does not give rise to such a claim "so long as state law provides for an adequate post-deprivation remedy and the deprivation was the result of [a] 'random and unauthorized' act." Defs.' Br. 13. In their reply brief, defendants appear to abandon this argument—and for good reason. *See* Defs.' Reply 1 ("As an initial matter, for the purposes of Defendants' motion, Defendants concede that the killing of a companion animal may give rise to an unlawful seizure claim under the Fourth Amendment."). As plaintiffs observe, it seems that defendants' initial argument rested on an erroneous interpretation of plaintiffs' claim. Plaintiffs do not assert a claim for deprivation of property without due process of law. If they did, defendants are correct that such a claim would be barred because Lola's death did not arise from "established state procedure," and was instead the result of a "random and unauthorized action." *Hudson v. Palmer*, 468 U.S. 517, 532 (1984). In such a case, the Supreme Court has held that "an unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause" because a post-deprivation state law remedy, in the form of an action for conversion, is available to the plaintiff. *Id.* at 533; *see also Brown v. Muhlenberg Twp.*, 269 F.3d 205, 213–14 (3d Cir. 2001) (dismissing a procedural due process claim based on the killing of a pet where state law provided an alternative remedy in the form of an action for conversion). However, this limitation is immaterial, as plaintiffs do not assert a procedural due process claim, and the Second Circuit clearly entitles them to assert a Fourth Amendment unreasonable seizure claim based on the set of facts alleged here. *See Carroll v. County of Monroe*, 712 F.3d 649, 651 (2d Cir. 2013).

nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests" implicated by the particular situation. *Tennessee*, 471 U.S. at 8 (quoting *Place*, 462 U.S. at 703). The reasonableness inquiry "is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989). An officer's actions are not to be judged "with the 20/20 vision of hindsight," *id.* at 396, and the "analysis allow[s] for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving," *Brown v. Battle Creek Police Dep't*, 844 F.3d 556, 567 (6th Cir. 2016) (alteration in original) (quoting *Robinson v. Pezzat*, 818 F.3d 1, 8 (D.C. Cir. 2016)).

In the context of the fatal shooting of a pet, there are several specific considerations that the court must keep in mind. First, it is well-established that the killing of a pet dog constitutes "a severe intrusion given the emotional attachment between a dog and an owner." *Carroll*, 712 F.3d at 651; *see also Kendall v. Olsen*, 237 F. Supp. 3d 1156, 1167 (D. Utah 2017) ("[C]ourts have recognized that most dog owners think of dogs solely in terms of an emotional relationship, rather than a property relationship." (internal quotation marks and citation omitted)); *Altman v. City of High Point*, 330 F.3d 194, 205 (4th Cir. 2003) ("Dogs have aptly been labeled 'Man's Best Friend,' and certainly the bond between a dog owner and his pet can be strong and enduring."). On the other side of the balance, however, the governmental interest is "significant": dogs may represent a serious risk to the safety of officers and the general public, and in some circumstances, it may be "reasonable for an officer to shoot a dog that he believes poses a threat to his safety or the safety of the community." *Carroll*, 712 F.3d at 651. In particular, "the state's interest in protecting life and property may be implicated when there is reason to believe [a] pet poses an imminent danger."

*Brown v. Muhlenberg Twp.*, 269 F.3d 205, 210 (3d Cir. 2001). As long as it was reasonable for the officer to believe that danger was imminent, a fatal seizure may be justified even if the dog did not actually pose a danger to the officer. "[T]he law does not require the officer to wait until the approaching animal is within biting distance or is leaping at him before taking protective action." *Dziekan v. Gaynor*, 376 F. Supp. 2d 267, 272 (D. Conn. 2005) (citing *Warboys v. Proulx*, 303 F. Supp. 2d 111, 118 (D. Conn. 2004)).

Despite the important governmental interests involved, I conclude that plaintiffs' complaint clearly states a claim for an unreasonable seizure in violation of their Fourth Amendment rights. According to plaintiffs' allegations, Lola was shot by Officer Germain immediately after Azurdia opened the door. Just before the shooting, she was quiet, calm, and did not bark, lunge, or exhibit any behavior that could be considered "aggressive or threatening." SAC ¶¶ 31–32. The mere presence of a dog inside of an apartment—absent any actions that could reasonably be considered dangerous—does not justify a seizure, let alone one this serious and intrusive. *See, e.g.*, *Kendall*, 237 F. Supp. 3d at 1167 ("[W]hen a dog is seized—and especially, as here, where it is killed, not merely injured or detained—the intrusion on the owner weighs heavily in favor of finding the seizure unreasonable and constitutional."); *Branson*, 2015 WL 5562174, at *5 ("Incidents involving a dog that 'has not actually attacked a person' are closer cases and can demonstrate that the deadly force was unreasonable." (citing *Altman*, 330 F.3d at 206)). Furthermore, the fact that Lola was shot inside plaintiffs' apartment—and not, as in many of the cases cited by defendants, while running loose in public—weighs in favor of a finding that the seizure here impermissibly interfered with plaintiffs' strong Fourth Amendment interests in Lola's protection. *Cf. Altman*, 330 F.3d at 205 (observing that the "private interest" decreases when a dog

"leaves the control of his owner and runs at large in a public space," while "the government interest in controlling the animal" increases).

Even if I chose to consider the additional facts from plaintiffs' section 50-h hearing, my conclusion would remain the same. Defendants argue that the 50-h hearing transcripts include several facts that undermine the plaintiffs' claims: (1) Lola is a 63-pound pit bull; (2) Azurdia acknowledged that Lola "approach[ed]" the officers when the door opened; and (3) after Lola was shot, one of the officers told plaintiffs that he had previously warned them to "keep [Lola] away" before he pulled the trigger. *See* Defs.' Br. 7 (citing the plaintiffs' 50-h testimony). Though defendants argue that plaintiffs' failure to include these allegations in their complaint amounts to a substantial misrepresentation—an attempt to "shield[] themselves from their own fatal admissions"—defendants seriously overstate the importance of these facts to the ultimate question before the court: whether plaintiffs plausibly allege that Officer Germain acted unreasonably in fatally shooting plaintiffs' dog. *See* Defs.' Br. 5 n.1; Defs.' Reply 2–3 n.2.

Plaintiffs' 50-h testimony is nearly identical to the allegations contained in the complaint: Azurdia affirms repeatedly that Lola did not bark, attack, bite, or otherwise make or attempt to make contact with the officers. *See* Aribakan Decl. Ex. B, at 10:25–11:19. In the context of Azurdia's clear denials that Lola exhibited any threatening behavior, his acknowledgment that Lola "approach[ed]" the officers does not indicate that she displayed actions that could reasonably be considered threatening. To the contrary, a dog's calm and slow approach is markedly different from the sort of rapid advancement that might otherwise justify a seizure. *See, e.g.*, *Warboys*, 303 F. Supp. 2d at 117–18 (dismissing an unreasonable seizure claim where the dog was "demonstrably not able to be restrained by its owner" and was moving towards "the officer at a rate of 6 feet per second"); *Schutt v. Lewis*, No. 6:12-cv-1697-Orl-37DAB, 2014 WL 3908187, at *3 (dismissing an

unreasonable seizure claim where the officer shot a "rapidly approaching dog that was large, uncollared, and noncompliant with its owners commands"). Though an officer "need not wait to be mauled or attacked before employing force in self-defense," the officer may not utilize deadly force against a dog unless there is an actual basis to believe that the dog posed an "imminent threat." *Kendall*, 237 F. Supp. 3d at 1170; *see also Ray v. Roane*, No. 5:17-cv-00093, 2018 WL 4515893, at *5 (W.D. Va. Sept. 20, 2018) (dismissing a claim based on the fatal shooting of a dog where "there is no allegation that [the dog] was calm or retreating"), *appeal docketed*, No. 18-2120 (4th Cir. Sept. 27, 2018).

Likewise, while the fact that Lola was a pit bull may be relevant to the Fourth Amendment analysis, *see, e.g.*, *Branson*, 2015 WL 5562174, at *5 (listing "[t]he breed of the dog" as one of the factors to be considered as part of the "totality of the circumstances"), a breed's reputation for aggression does not, on its own, justify a fatal shooting, *see id.* at *6 ("Even though[] [the defendant] reasonably perceived the dog to be a dangerous breed, that fact alone does not justify a seizure in the form of shooting the dog. Rather, the other relevant factors also must be considered."). An officer confronted by a dog whose breed is "known for fighting, aggressive behavior," *Niesen v. Garcia*, No. 2:14-2921 WBS CKD, 2016 WL 4126382, at *9 (E.D. Cal. July 5, 2016), has a right to remain on guard, but the dog's presence during an arrest does not itself give an officer license to seize it. Additionally, Officer Germain's suggestion *after* the shooting that he had previously directed plaintiffs to restrain Lola does not mean that he had in fact given the plaintiffs such a warning—nor does it mean that Lola was behaving with aggression towards the officers before Officer Gemain pulled the trigger. When paired with the plaintiffs' serious allegations regarding the defendants' fabrications after the shooting, this allegation merely raises

"concrete issues of fact as to the reasonableness of [Officer] Germain's shooting Lola." Pls.' Opp'n 9. Such disputed issues of fact cannot be the basis for dismissal of a claim on a 12(b)(6) motion.

Nor have defendants demonstrated that Officer Germain is entitled to qualified immunity at this stage of the litigation. Though a qualified immunity defense should ordinarily be resolved as "early in the proceedings" as possible, *Ray*, 2018 WL 4515893, at *7 (quoting *Saucier v. Katz*, 533 U.S. 194, 200 (2001)), an officer is not entitled to qualified immunity if the facts alleged by plaintiffs fail to provide him with a reasonable basis for believing that fatal force was necessary. At the time of Lola's death, the law clearly established that the fatal seizure of a pet without justification constitutes a Fourth Amendment violation. *See Carroll*, 712 F.3d at 651. And based on plaintiffs' version of the moments leading up to Lola's shooting, a reasonable officer in Officer Germain's position would have known that shooting Lola—a dog who had not exhibited any behavior suggesting a tendency towards aggression—was unlawful. *See, e.g.*, *Muhlenberg Twp.*, 269 F.3d at 209, 211–12 (denying dismissal of an unreasonable seizure claim on the basis of qualified immunity where a loose dog in a parking lot was shot by an officer despite the fact that she "was stationary and not growling or barking"). This is not a situation where the officer may have reasonably believed that Lola posed a threat, even if she did not in fact intend to cause any harm. *See, e.g.*, *Stephenson v. McClelland*, 632 F. App'x 177, 184–85 (5th Cir. 2015) (affirming dismissal of a Fourth Amendment claim where the officer reasonably believed the dog was aggressively baring its teeth, despite the owner's argument that the dog was merely "smiling"). On this record and at this stage of the litigation, defendants have not demonstrated that they are entitled to qualified immunity on plaintiffs' unconstitutional seizure claim.

Accordingly, defendants' motion to dismiss the unreasonable seizure claim is denied.

## II. Defendants' motion to dismiss plaintiffs' conversion claim is denied.

For largely the same reasons, I deny defendants' motion to dismiss plaintiffs' conversion claim, which is based on the same facts that give rise to their Fourth Amendment unreasonable seizure claim. "Under New York law, 'conversion is any unauthorized exercise of dominion or control over property by one who is not the owner of the property which interferes with and is in defiance of a superior possessory right of another in the property.'" *Frederique v. County of Nassau*, 168 F. Supp. 3d 455, 485 (E.D.N.Y. 2016) (quoting *E. Coast Novelty, Inc. v. City of New York*, 781 F. Supp. 999, 1011–12 (S.D.N.Y. 1992)). To prevail on such a claim, a plaintiff must demonstrate "(1) a possessory right or interest in the property and (2) defendant's dominion over the property or interference with it, in derogation of plaintiff's rights." *Id.* (quoting *Anghel v. N.Y. State Dep't of Health*, 947 F. Supp. 2d 284, 303 (E.D.N.Y. 2013)).

Defendants acknowledge that Officer Germain's fatal shooting of Lola constitutes an exercise of "dominion and control over Plaintiff's property right in Lola." Defs.' Br. 23. However, they argue that Officer Germain's interference with plaintiffs' property rights was justified in the circumstances by Lola's behavior. *Id.*[9] For the reasons just explained, I hold that Officer Germain's actions in killing Lola were not justified by the totality of the circumstances as alleged by the plaintiffs. Accordingly, the defendants' motion to dismiss this claim is denied.

### III. Defendants' motion to dismiss plaintiffs' state and federal claims for false arrest is granted.

In addition to plaintiffs' joint claims related to the injuries they suffered as a result of Lola's death, Azurdia also asserts a number of claims based on his arrest and subsequent prosecution. His

---

[9] Defendants do not articulate the legal basis for this defense to a conversion claim, but it seems that they are arguing that Officer Germain's actions were justified by necessity. *See, e.g.*, *Nat'l Liability & Fire Ins. Co. v. Rick's Marine Corp.*, 268 F. Supp. 3d 371, 376 (E.D.N.Y. 2017) (acknowledging that "public and private necessity" are "recognized justifications in conversion"); *Barton-Barnes Inc. v. State*, 583 N.Y.S.2d 547, 548 (App. Div. 1992) (defining public necessity as a defense to a conversion claim where "the act is or is reasonably believed to be necessary for the purpose of avoiding a public disaster") (quoting Restatement [Second] of Torts § 262).

false arrest claim, brought under both state and federal law, hinges on the argument that defendants lacked probable cause to arrest him for theft of services in violation of New York Penal Law § 165.15. *See* SAC ¶¶ 109–17, 133–37. Defendants argue that they had either probable cause or arguable probable cause to arrest Azurdia for theft of services. *See* Defs.' Br. 15–18. For the following reasons, I agree with defendants, and I grant defendants' motion to dismiss this claim.

"A § 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures, . . . is substantially the same as a claim for false arrest under New York law." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (internal citation omitted) (citing cases). Both claims require a plaintiff to "show, *inter alia*, that the defendant intentionally confined him without his consent and without justification." *Id.* Probable cause establishes justification for a warrantless arrest, defeating a false arrest claim. *Id.* Thus, Azurdia's false arrest claim turns on whether the defendants had probable cause to arrest him for theft of services or, alternatively, "whether the officer's probable cause determination was objectively reasonable." *Gonzalez v. City of Schenectady*, 728 F.3d 149, 157 (2d Cir. 2013).

"In general, probable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Weyant*, 101 F.3d at 852. The relevant inquiry focuses on "the facts as the officers knew them in light of the specific elements of each crime." *Gonzalez*, 728 F.3d at 155. When a person who claims to be the victim of a crime reports the crime to the police, that tip can form the basis for probable cause to arrest. *See, e.g.*, *Singer v. Fulton Cty. Sheriff*, 63 F.3d 110, 119 (2d Cir. 1995). However, if the officer becomes aware of "circumstances that raise doubts as to the victim's veracity," *id.*, the officer's "failure to make further inquiry when a reasonable person would have

done so may be evidence of lack of probable cause," *Carlton v. Nassau Cty. Police Dep't*, 306 A.D.2d 365, 366 (N.Y. App. Div. 2003). At the same time, an officer is not obligated to investigate all defenses that may be raised by the arrestee, nor must the officer "have proof of each element of a crime" before an arrest can be made. *Valade v. City of New York*, 949 F. Supp. 2d 519, 526 (S.D.N.Y. 2013); *see also Rivera v. City of New York*, No. 16519/07, 2011 WL 4537020, at *4 (N.Y. Sup. Ct. 2011).

Defendants argue that they are entitled to qualified immunity on Azurdia's false arrest claim even if they did not actually have probable cause to arrest Azurdia. "Under federal law, a police officer is entitled to qualified immunity where '(1) his conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known, or (2) it was "objectively reasonable" for him to believe that his actions were lawful at the time of the challenged act." *Jenkins v. City of New York*, 478 F.3d 76, 87 (2d Cir. 2007) (quoting *Cerrone v. Brown*, 246 F.3d 194, 199 (2d Cir. 2001)). In the context of a false arrest claim, a defendant has qualified immunity if there was "'arguable' probable cause at the time of arrest." *Id.* Arguable probable cause is not equivalent to "'almost' probable cause." *Id.* Instead, the essential inquiry focuses on whether "it was objectively reasonable for the officer to believe that probable cause existed, or . . . officers of reasonable competence could disagree on whether the probable cause test was met." *Kass v. City of New York*, 864 F.3d 200, 206 (2d Cir. 2017) (alteration in original) (quoting *Myers v. Patterson*, 819 F.3d 625, 633 (2d Cir. 2016)). New York law provides defendants with a similar immunity if the arresting officer's determination that there was probable cause was "objectively reasonable." *Jenkins*, 478 F.3d at 88. Though New York's qualified immunity standard includes a "good faith" subjective element, the court need not make a factual determination regarding the officer's subjective intent as long as the officer acted reasonably in

believing that there was probable cause to arrest. *Id.*; *see also Tsesarskaya v. City of New York*, 843 F. Supp. 2d 446, 460 n.12 ("'Good faith immunity' under New York law is similar to qualified immunity under federal law." (citing *Jenkins*, 478 F.3d at 86)).

Azurdia was charged with "theft of services for tampering with a fare meter," a specific theft of services crime in violation of New York Penal Law § 165.15(6). Both parties acknowledge that Azurdia did not actually "tamper[] with a fare meter." *See* SAC ¶ 85; Defs.' Br. 17 n.4. To defeat a false arrest claim, however, the defendant need not demonstrate that there was probable cause to arrest for the charged crime as long as there was probable cause to arrest for *any* possible crime. *See Betts v. Shearman*, No. 12 Civ. 3195(JPO), 2013 WL 311124, at *6 (S.D.N.Y. Jan. 24, 2013). "[I]t is not relevant whether probable cause existed with respect to each individual charge, or, indeed, any charge actually invoked by the arresting officer at the time of arrest." *Jaegly v. Couch*, 439 F.3d 149, 154 (2d Cir. 2006). Here, the relevant question is whether there was probable cause—or arguable probable cause—to arrest Azurdia for theft of services in violation of New York Penal Law § 165.15(3). A person is guilty of that crime if,

> With intent to obtain . . . taxi . . . service without payment of the lawful charge therefor, or to avoid payment of the lawful charge for such transportation service which has been rendered to him, he obtains or attempts to obtain such service or avoids or attempts to avoid payment therefor by force, intimidation, stealth, deception, or mechanical tampering, or by unjustifiable failure or refusal to pay.

It is undisputed that Azurdia had not paid the taxi driver when he left the car early in the morning on April 23, 2017. *See* SAC ¶¶ 17–20. It is also undisputed that Azurdia told the driver that he would return with the money he owed five minutes after he left the car, but, twenty minutes later, he had still not returned. *Id.* ¶ 24. Azurdia alleges that he had given the driver his ID card as collateral and told him to hold onto the card until he returned with the money. *Id.* He asserts that this fact demonstrates that he lacked the requisite mental state—intent—to be arrested for the crime

of theft of services. Pls.' Opp'n 12 ("Fraudulent intent is the gravamen of the offense of theft of services."). Further, Azurdia argues that the taxi driver's phone call to the 911 operator merely expressed concern about Azurdia's failure to return within the specified time period, and, at best, the call provided the officers with "reasonable suspicion to inquire why Mr. Azurdia had not returned"—not probable cause to arrest him. Pls.' Opp'n 14.

Taking the facts in the light most favorable to plaintiffs, I find that the officers had either probable cause or arguable probable cause to arrest Azurdia for theft of services.[10] It is irrelevant whether the driver's 911 call was intended to express concern rather than report a crime. The driver's report—which indicated that Azurdia had not paid for his taxi ride, that he was supposed to return within five minutes, and that he had failed to return or pay the driver twenty minutes later—provided the officers with a reasonable basis to believe that they had probable cause to arrest him. *See, e.g.*, *Cerrone*, 246 F.3d at 203 ("[P]olice officers are entitled to draw reasonable inferences from the facts they possess at the time of a seizure" when effecting an arrest); *People v. Frankel*, 492 N.Y.S.2d 671, 676 (Crim. Ct. 1985) ("An intent to avoid payment need not be established by direct or explicit evidence; it may be established by circumstantial evidence."). Even if the officers met with the driver to learn more about the arrangement he had made with Azurdia *before* they knocked on his apartment door,[11] their knowledge that Azurdia had left his ID as collateral does not demonstrate that Azurdia lacked the requisite intent to be guilty of the crime. This is particularly true here because so much time had passed between Azurdia's initial

---

[10] Because the existence of arguable probable cause entitles defendants to dismissal on the false arrest claims, I need not decide whether there was actual probable cause to arrest Azurdia. *Cf. Dewitt v. City of Troy*, No. 1:09-cv-16, 2010 WL 3312634, at *4–5 (N.D.N.Y. Aug. 19, 2010) (holding that there was either "probable cause, or arguable probable cause" to arrest plaintiff, without deciding which).

[11] As discussed above, plaintiffs do not explicitly allege that such a conversation occurred, but this is a reasonable inference based on the officers' subsequent acquisition of Azurdia's ID.

promise to return with the money and the officers' arrival at his apartment. The officers did not need conclusive proof that Azurdia intended to avoid payment; arguable probable cause requires only that they had an objectively reasonable basis for drawing that conclusion. *See, e.g.*, *Valade*, 949 F. Supp. 2d at 526. Furthermore, plaintiffs do not allege that the taxi driver was unreliable or that the officers were aware of any facts that should have led them to question his trustworthiness and inquire further before making the arrest. *See, e.g.*, *Ricciuti v. N.Y.C. Trans. Auth.*, 124 F.3d 123, 128 (2d Cir. 1997) (noting that an officer is entitled to believe an informant's version of events when it is plausible and the informant's credibility is not called into question).

Plaintiffs cite two cases in support of their argument that defendants did not have probable cause or arguable probable cause to arrest Azurdia, but both are materially distinguishable from the instant case. In *Simpson v. City of New York*, the Second Circuit reversed the district court's order granting summary judgment to an officer who had arrested the plaintiff for theft of services. 793 F.3d 259, 265–68 (2d Cir. 2015). There, the arresting officer was aware of several facts that cast doubt on whether the plaintiff intended to avoid payment of her bus fare: the front entrance of the bus was blocked to patrons; the bus driver had told patrons to enter through the back of the bus; and, at the time that the officer arrested plaintiff, she was waiting in line to pay her fare. *Id.* at 266. These facts collectively established a "genuine issue for a jury as to whether a reasonable officer in [defendant's] position could have had reasonable grounds to believe that [plaintiff] *intended* to commit . . . theft of services." *Id.* (emphasis added). By contrast, Azurdia does not allege that there were any physical barriers that prevented him from paying the driver; instead, he suggests that he would have returned to pay the driver within the five minutes promised if not for the fact that he inadvertently "dozed off." SAC ¶ 22. Azurdia also does not allege that he was arrested by the officers while he was in the process of paying the driver or on his way to pay the

driver. In fact, plaintiffs do not allege that Azurdia attempted to pay the driver at *any* point during the events in question.

The factual situation in *Carlton v. Nassau County Police Department*, another case relied upon by plaintiffs, also differs from the situation here. In that case, the New York Appellate Division's Second Department held that an officer did not have probable cause to arrest the plaintiff for theft of services after the plaintiff failed to pay a portion of his restaurant bill. 306 A.D. at 365–66. Though the restaurant owner signed an affidavit stating that the plaintiff "left without paying the bill," the plaintiff alleged that he had in fact paid a portion of the bill but actively disputed the remainder. *Id.* He also left his business card with the restaurant owner before exiting the restaurant. *Id.* Because the plaintiff alleged that the arresting officer was aware of these facts, the court found that the officers should have conducted additional investigation rather than blindly trusting the veracity of the restaurant owner's affidavit. *Id.*

These facts are distinguishable from the facts that led to Azurdia's arrest: here, plaintiffs do not suggest that the driver lacked trustworthiness, and there is no allegation that Azurdia and the driver had an ongoing dispute regarding the money Azurdia owed. Though the plaintiff in *Carlton* left a business card with the restaurant owner, the fact that the bill was actively *disputed*—rather than the fact that plaintiff left a card that provided his contact information—seems to be the primary basis for the court's conclusion. *See id.* (emphasizing the fact that "the bill was disputed and the arresting police officers knew that the bill was disputed"). At the very least, the ambiguity created by the court's decision—which does not clearly identify which factor was most significant in defeating probable cause—entitles the defendant officers to qualified immunity regarding this issue, as reasonable officers could differ in their interpretation of whether probable cause existed on these facts. *See, e.g.*, *Rivers v. Fischer*, 390 F. App'x 22, 24 (2d Cir. 2010) (holding that the

defendants were entitled to qualified immunity based on "the ambiguity in the law" (summary order)).

Plaintiffs raise serious allegations regarding the defendants' motives, arguing that the defendant officers arrested Azurdia in an effort to justify the shooting of Lola. *See* SAC ¶¶ 70–74. While these allegations are troubling, an officer's motivations for arresting a plaintiff are irrelevant to the probable cause analysis. *See, e.g.*, *Restey v. Higgins*, 675 N.Y.S.2d 725, 727 (App. Div. 1998) ("A police officer's motives . . . are immaterial with respect to the issue of whether an arrest is based on probable cause.").[12] For qualified immunity purposes, too, an officer is shielded from liability if it was "objectively reasonable" to believe probable cause existed, *Jenkins*, 478 F.3d at 88—regardless of the motivation that may have informed the decision to arrest.

Likewise, neither the fact that Chibbaro offered to pay the driver nor the fact that the driver repeatedly requested the money are relevant to this analysis. First, as discussed above, *see supra* note 2, there is no allegation that the officers who arrested Azurdia were aware of Chibbaro's offers to pay the driver, nor would such an allegation alter the fact that Azurdia did not himself attempt to pay the driver. Second, the fact that the taxi driver seemed more invested in getting his money than seeing Azurdia arrested does not play a role in the probable cause analysis. Even if there were faster, easier, and less intrusive alternatives to an arrest, a false arrest claim must be dismissed if the officers had either probable cause or arguable probable cause to arrest the plaintiff.

---

[12] Plaintiffs cite *Simpson* to support their argument that the officers' motives are relevant to the probable cause determination. *See* Pls.' Opp'n 14. While the court in *Simpson* noted that the plaintiff plausibly alleged that the officer may have arrested her to retaliate for the fact that she spurned his romantic advances, *see* 793 F.3d at 266, the court focused most of its analysis on the other factors that demonstrated that plaintiff may not have had an intention to avoid payment—including the fact that the front door was broken and the plaintiff was standing in line to pay for the bus at the time of the arrest. *Id.* Those factual circumstances are completely absent from this case, and *Simpson* does not support plaintiffs' argument that allegations regarding an improper motivation for an arrest—absent other factors that seriously undermine the plaintiff's intent to avoid payment—can defeat the existence of probable cause.

*Cf. Garris-Rivers v. Metro Transp. Auth.*, No. 13 Civ. 9034 (GBD), 2017 WL 462602, at *4 (S.D.N.Y. Jan. 27, 2017) (observing that even if an officer's decision to arrest was a "harsh reaction" to the circumstances, the officer is shielded from liability if probable cause existed).

In short, once Azurdia failed to return to pay the taxi driver within a reasonable period of time, the defendants had either probable cause or arguable probable cause to arrest him for theft of services. Though Azurdia may very well have intended to return to pay the driver when he went to his apartment, he did not. This fact alone provided the officers with a sufficient basis to arrest him for theft of services, and plaintiffs' false arrest claim is therefore dismissed. *See, e.g.*, *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006) ("[T]he fact that an innocent explanation may be consistent with the facts alleged . . . does not negate probable cause." (quoting *United States v. Fama*, 758 F.2d 834, 838 (2d Cir. 1985))).

## IV. Defendants' motion to dismiss plaintiff's claim of denial of the right to a fair trial is denied.

Azurdia alleges that the defendants interfered with his right to a fair trial by fabricating evidence against him and forwarding it to the prosecutors. *See* SAC ¶¶ 118–24. Though defendants argue that the taxi driver's accusation that Azurdia failed to pay his fare defeats this claim, *see* Defs.' Br. 19–20, it is well-established that "probable cause is no defense to a denial of the right to a fair trial claim." *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 278 (2d Cir. 2016); *see also Ricciuti*, 124 F.3d at 130 (holding that the existence of probable cause to arrest does not shield a defendant from liability for fabricating evidence because "[n]o arrest, no matter how lawful or objectively reasonable, gives an arresting officer or his fellow officers license to deliberately manufacture false evidence against an arrestee"). A false arrest claim is distinct from a claim based on the denial of a plaintiff's right to a fair trial, and the latter can proceed even where the former fails as a matter of law. *See, e.g.*, *Ricciuti*, 124 F.3d at 130.

"When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is redressable in an action for damages under 42 U.S.C. § 1983." *Id.* "A plaintiff establishes a denial of fair trial claim when a police officer (1) 'creates false information likely to influence a jury's decision,' (2) 'forwards that information to prosecutors,' and (3) the plaintiff is deprived of [his] liberty as a result." *Buie v. City of New York*, No. 12-CV-4390(RJD)(CLP), 2015 WL 6620230, at *9 (E.D.N.Y. Oct. 30, 2015) (quoting *Ricciuti*, 124 F.3d at 130)). "[A]ll of the elements [of the claim] can be satisfied regardless of whether or not the plaintiff was ultimately tried." *Manigault v. City of New York*, No. 11 Civ. 4307 (AJN), 2012 WL 13049173, at *6 (S.D.N.Y. Apr. 19, 2012). In other words, a plaintiff who does not actually stand trial as a defendant can nevertheless assert a denial of a fair trial claim. *Id.* This is because the constitutional violation occurs at the moment that the false information is transmitted to prosecutors; it does not depend on the information's subsequent use at trial. *See Ricciuti*, 124 F.3d at 127, 130 (reversing district court order granting summary judgment to defendants on fair trial claim where all criminal charges were dismissed before trial).

Plaintiffs allege sufficient facts to state a claim for denial of the right to a fair trial. In their second amended complaint, plaintiffs allege that the officers met with prosecutors to communicate a fabricated story about the events leading up to Azurdia's arrest and Lola's shooting. *See* SAC ¶¶ 94–95. They allege that this fabricated story included the false allegation that Azurdia "refused to pay" the driver, erroneously suggesting that the officers asked Azurdia to pay the driver but that he declined to do so. *Id.* This is materially distinct from the facts in plaintiffs' complaint, which, as described above, support a finding that Azurdia *failed* to pay the driver but not that he refused to give money after being provided with an opportunity to pay the debt. *Cf.* N.Y. Penal Law §

165.15(3) (McKinney 2018) (providing that a defendant can be guilty of the crime of theft of services when he either "unjustifiabl[y] fail[s]" *or* "refus[es]" to pay). Though not explicitly alleged by plaintiffs, it is also reasonable to infer from plaintiffs' complaint that the officers told the prosecutors the fabricated narrative about Lola's behavior, which included the false allegation that the officers asked Azurdia to restrain Lola several times before he abruptly opened the apartment door and allowed her to lunge towards them in an aggressive and dangerous manner. *See* SAC ¶ 94 (alleging that Officer Toribio's "false allegations" to the District Attorney's office "were based on the false narrative" he had previously developed with the other officers); *see also id.* ¶ 74 (alleging that the defendants' "false narrative" included fabricated details about Lola's behavior and Azurdia's refusal to respond to the officers' requests to restrain her); *Martin v. Coughlin*, 895 F. Supp. 39, 43 (N.D.N.Y. 1995) ("In ruling on a motion to dismiss . . . the court must liberally construe all reasonable inferences in the complaint in the light most favorable to the plaintiff.").

Plaintiffs persuasively argue that these allegations would have been likely to influence a jury's decision. *See* Pls.' Opp'n 15 (arguing that defendants crafted false allegations to "portray[] him as a criminal and cover[] up their misconduct"). The allegedly fabricated narrative portrays Azurdia as dangerous and obstinate, suggesting that he intentionally allowed his dog to charge towards the officers and was unwilling to pay his debts. The fact that this information was not actually presented to a jury is irrelevant for the purpose of this claim. *See Bryant*, 2016 WL 6426372, at *6 ("The phrase 'likely to influence a jury's decision' refers to the materiality of the information, not its likelihood to be presented to a jury." (citing cases)). Fabricated evidence, even where it would be inadmissible at trial, can influence many critical aspects of a prosecution, including a prosecutor's assessment of the reliability of other evidence and a judge's rulings on

pre-trial motions. Even though the officers had probable cause or arguable probable cause to arrest Azurdia without these fabrications, they are not shielded from liability; to hold otherwise "would unduly limit an arrestee's right to relief when a police officer fabricates evidence." *Garnett*, 838 F.3d at 278.

Because plaintiffs' allegations are neither vague nor conclusory, they succeed in demonstrating that this alleged narrative would have materially misrepresented the facts, thus increasing the chances that a jury would be prejudiced against Azurdia. *See, e.g.*, *Long v. Vazquez*, No. 14-CV-9908 (VEC), 2016 U.S. Dist. LEXIS 104837, at *10 (S.D.N.Y. Aug. 8, 2016) (holding that the "[p]laintiff's fair trial claim is not vague or conclusory" where she specifically alleged that the officers fabricated facts that made her seem more culpable); *Jovanovic v. City of New York*, No. 04 Civ. 8437(PAC), 2006 WL 2411541, at *13 (S.D.N.Y. Aug. 17, 2006) (sustaining a claim for denial of a fair trial where the officer allegedly "reported to prosecutors that he had observed incriminating evidence in Plaintiff's apartment and falsely stated that Plaintiff had conspired to obstruct the police at the time of the search" (internal quotation marks and citation omitted)). Furthermore, defendants are not entitled to qualified immunity on this claim, as "[a]ny reasonable officer would have known that Plaintiff's rights would be violated by fabricating evidence and making false statements to prosecutors." *Jovanovic*, 2006 WL 2411541, at *13.

Accordingly, Azurdia's claim for the denial of his right to a fair trial survives, and I deny defendants' motion to dismiss this claim.

## V. Defendants' motion to dismiss plaintiffs' negligence claim is granted.

Plaintiffs assert a negligence claim against the defendant officers, arguing that the defendants breached their duty toward plaintiffs by negligently shooting and killing Lola. *See* SAC ¶¶ 141–45. "Though litigants may allege alternate, or inconsistent, claims in a pleading, when the conduct alleged, if true, may only give rise to liability for an intentional act, a claim of negligence

may be dismissed." *Bah v. City of New York*, No. 13 Civ. 6690(PKC)(KNF), 2014 WL 1760063, at *13 (S.D.N.Y. May 1, 2014) (internal citation omitted); *Shen v. City of New York*, 725 F. App'x 7, 16 (2d Cir. 2018) (summary order) (noting that it is a permissible "legal theory" to argue that conduct was both intentional and negligent, but the record before the court permitted only a claim of intentional conduct).

Here, plaintiffs allege that Officer Germain shot Lola "several times" immediately after the apartment door opened. SAC ¶ 35. Plaintiffs do not allege any facts that would indicate that this shooting was negligent or inadvertent; to the contrary, they describe the shooting as a wrongful and intentional overreaction. *See, e.g.*, *Ortiz v. City of New York*, No. 15cv2206(DLC), 2016 WL 7009059, at *3 (S.D.N.Y. Nov. 30, 2016) (dismissing a negligence claim because the plaintiff "describes the defendants as engaging in egregious misconduct, includ[ing] an unprovoked attack on him").

Because plaintiffs plead no factual allegations that would support the conclusion that Officer Germain behaved negligently when he shot Lola, this claim is dismissed. *See Trott v. Merit Dep't Store*, 484 N.Y.S.2d 827, 829 (App. Div. 1985) (dismissing a negligence claim where "[t]he allegations of the complaint do not . . . assert a cause of action for negligence upon the facts herein").

## VI.     Defendants' motion to dismiss plaintiffs' New York State Constitutional claims is granted.

Finally, plaintiffs assert two claims for violations of their rights under the New York State Constitution, arguing that defendants' conduct violated their rights to due process of law and to freedom from unreasonable seizures. *See* SAC ¶¶ 146–49 (citing N.Y. Const., art. I, §§ 6, 12).

Where "alternative remedies" are available—at common law or under § 1983—a plaintiff may not sustain a claim under the New York State Constitution. *Alwan v. City of New York*, 311

F. Supp. 3d 570, 586 (E.D.N.Y. 2018); *see also Allen v. Antal*, 665 F. App'x 9, 13 (2d Cir. 2016) (summary order) ("The New York State Constitution provides a private right of action where remedies are otherwise unavailable at common law or under § 1983."). Here, plaintiffs have alternative common law and § 1983 remedies for all state constitutional claims they assert. Their "unreasonable seizure" claim under the New York State Constitution is properly asserted as a § 1983 claim for a violation of their Fourth Amendment rights, and their "due process" claim under the New York State Constitution is properly asserted as a § 1983 claim for false arrest and deprivation of the right to a fair trial. Though plaintiffs argue that their § 1983 claims do not provide an adequate alternative because "violations of the State Constitution may be broader than those available under [§ 1983]," Pls.' Opp'n 19 (citations omitted), they cite no authority to support the contention that the alternative remedy must be *equal* to the relief available under the New York State Constitution. Instead, courts in this circuit have held that the New York State Constitution does not provide a private right of action so long as there is an alternative remedy that covers "violations of parallel provisions of the U.S. Constitution." *Alwan*, 311 F. Supp. 3d at 586 (citing cases). To hold otherwise would ignore the well-established principle that causes of action under the New York State Constitution are intended to be "narrow" and are "available only when necessary to effectuate the purposes of the State constitutional protections [that the] plaintiff invokes." *Biswas v. City of New York*, 973 F. Supp. 2d 504, 522 (S.D.N.Y. 2013) (internal quotation marks and citation omitted).

Plaintiffs also argue that their state constitutional claims should not be dismissed because these claims provide their only opportunity to hold the City liable for the injuries suffered as a result of the officers' unconstitutional conduct. *See* Pls.' Opp'n 18. Plaintiffs are correct that "the weight of case law in this circuit supports the conclusion that § 1983 is not an adequate alternative

remedy for state-constitutional claims that rely on a theory of *respondeat superior*." *Alwan*, 311 F. Supp. 3d at 587. However, this argument overlooks the fact that plaintiffs have asserted parallel state tort claims against the defendant officers and that they may properly hold the City liable for those claims through the doctrine of *respondeat superior*. *See* SAC ¶¶ 150–51. Here, plaintiffs assert state-law claims for conversion and false arrest. Both claims cover the same "legal interests" and conduct as their due process and unreasonable seizure claims under the New York State Constitution. *See Alwan*, 311 F. Supp. 3d at 588.[13] As a result, plaintiffs have adequate alternative remedies for all claims they seek to assert under the New York State Constitution, and these claims are accordingly dismissed.

## CONCLUSION

For the foregoing reasons, defendants' motion to dismiss plaintiffs' complaint is granted in part and denied in part. Specifically, the unreasonable seizure, conversion, and denial of fair trial claims survive this motion, while the false arrest, negligence, and New York State Constitution claims are dismissed.

During the pre-motion conference I held with the parties in December 2018, plaintiffs agreed that their second amended complaint would constitute "their last and best pleading." Minute Entry, ECF No. 16. Despite this agreement, plaintiffs now ask for the opportunity to amend their complaint in the event that the court "perceive[s] deficiencies with respect to any of their claims." Pls.' Opp'n 20. I conclude that plaintiffs' false arrest and state constitutional claims fail as a matter faof law, and I therefore dismiss those claims with prejudice. However, because I cannot yet say

---

[13] To the extent that plaintiffs also wish to hold the City liable for the denial of a fair trial claim, it does not seem that New York's Constitution recognizes this claim in the circumstances alleged here. *See Baez v. Jetblue Airways Corp.*, No. 09-CV-596 (CPS)(SMG), 2009 WL 2447990, at *8 n.19 (E.D.N.Y. Aug. 3, 2009). Therefore, because plaintiffs would not otherwise be able to assert this claim against the City even if their New York State Constitution claims survived, plaintiffs suffer no prejudice through dismissal of this claim.

that permitting further amendment would be futile with respect to plaintiffs' negligence claim, that claim is dismissed without prejudice. If plaintiffs later learn facts that would plausibly support this claim, they may move to amend their complaint.


SO ORDERED.

Date:   March 28, 2019                                   _____/s/_____
        Brooklyn, New York                              Allyne R. Ross
                                                        United States District Judge