UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------- X

DIEGO AZURDIA and MARCELLA CHIBBARO,

                                      Plaintiffs,

    -against-

THE CITY OF NEW YORK, a municipal entity; Police Officer BARTY TORIBIO (Shield # 11061); Police Officer JEAN GERMAIN (Shield # 25671); all of whom are sued individually and in their official capacities,

                                    Defendants.

------------------------------------------------------------------- X

**THIRD AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

Index No.: 18-CV-4189 (ARR)(PK)

Plaintiffs Diego Azurdia and Marcella Chibbaro, by their attorneys, Beldock Levine & Hoffman LLP, as and for their complaint against the Defendants named above allege as follows:

**PRELIMINARY STATEMENT**

1.    This is a civil rights action in which the Plaintiffs, Diego Azurdia and Marcella Chibbaro ("Mr. Azurdia" and "Ms. Chibbaro" or "Plaintiffs" collectively), seek relief for Defendants' violations of their rights secured by 42 U.S.C. § 1983, the Fourth and Fourteenth Amendments to the United States Constitution, and the Constitution and laws of the State of New York.

2.    In the early morning hours of April 23, 2017, Mr. Azurdia was driven by taxi from the Bronx to his home in Brooklyn, New York. When the taxi arrived at his apartment building, Mr. Azurdia realized that he did not have funds to pay his taxi fare. Mr. Azurdia and the taxi driver agreed that Mr. Azurdia would go to his apartment to get the funds to pay his fare and that the taxi driver would hold Mr. Azurdia's New York City Identification Card as collateral. Mr. Azurdia went to his apartment but dozed off while he was in the process of

getting the funds.  Approximately twenty minutes later, Mr. Azurdia was awakened by someone knocking on his door.  Mr. Azurdia went to answer the door with his dog, Lola, at his side.  When Mr. Azurdia opened his apartment door, he encountered Defendant Police Officers Barty Toribio and Jean Germain.  Without warning and without lawful justification, Police Officer Jean Germain shot at Lola several times, critically injuring her.  Instead of obtaining medical aid or allowing Plaintiffs to aid Lola, Defendant Police Officers Toribio and Germain detained Plaintiffs while they called other police officers, including Lieutenant Richard Roe and Sergeant Michael Sinner.  These officers conspired on how to justify Police Officer Germain's misconduct of shooting Lola.  Ms. Chibbaro was eventually permitted to take Lola to a veterinary hospital, while Mr. Azurdia was arrested and falsely charged with N.Y.P.L § 165.15(6), theft of services for tampering with a fare meter.  At the veterinary hospital, Lola succumbed to the injuries Police Officer Germain had inflicted upon her and died.   The false charges against Mr. Azurdia were eventually dismissed.

3. Plaintiffs seeks (i) compensatory damages for the unlawful interference in the property interest in their dog, Lola, loss of liberty, psychological and emotional distress, and other injuries caused by the illegal and unconstitutional actions of the Defendants; (ii) punitive damages to deter such intentional or reckless deviations from well-settled constitutional law; (iii) costs and attorneys' fees; and (iv) such other and further relief as this Court deems equitable and just.

**JURISDICTION AND VENUE**

4. Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1343(a)(3) and (a)(4), as this action seeks redress for the violation of Plaintiffs' constitutional and civil rights.

5. Supplemental jurisdiction is conferred upon this Court by 28 U.S.C. § 1367(a) over any and all state law claims that are so related to the federal claims that they form part of the same case or controversy

6. Plaintiffs have complied with the requirements of New York General Municipal Law Section 50-i by making and serving a notice of claim on the Comptroller of the City of New York on July 19, 2017, within the time required by New York General Municipal Law Section 50-e. More than thirty days have elapsed since the service of that notice, and no offer of settlement has been made.

7. At the request of the City of New York, on October 19, 2017, Plaintiffs submitted to a hearing pursuant to New York General Municipal Law Section 50-h.

8. Pursuant to 28 U.S.C. § 1391(b), venue is proper in the Eastern District of New York, the judicial district in which the claims arose.

## JURY DEMAND

9. Pursuant to the Seventh Amendment of the United States Constitution, Plaintiffs requests a jury trial on all issues and claims set forth in this Complaint.

## PARTIES

10. At all relevant times to this action, Plaintiff Diego Azurdia was a resident of Kings County, New York.

11. At all relevant times to this action, Plaintiff Marcella Chibbaro was a resident of Kings County, New York.

12. Defendant City Of New York ("City") is a municipal entity created and authorized under the laws of the State of New York. It is authorized by law to maintain a police department and does maintain the New York City Police Department ("NYPD") which acts as its

agent in the area of law enforcement and for which it is ultimately responsible. The City assumes the risks incidental to the maintenance of a police force and the employment of police officers.

13. Defendants Lieutenant "Richard Roe" ("Lt. Roe"), Sergeant Michael Sinner ("Sgt. Sinner"), Police Officer Barty Toribio (Shield # 11061) ("P.O. Toribio"), Police Officer Jean Germain (Shield # 25671) ("P.O. Germain"), and Police Officers "John and/or Jane Does" Nos. 1, 2, 3, etc. ("Does") are NYPD police officers who unlawfully interfered with Plaintiffs' property interest in their dog, Lola, and/or caused false criminal charges to be lodged against Mr. Azurdia.

14. Defendants Lt. Roe, Sgt. Sinner, P.O. Toribio, P.O. Germain, and Does acted under color of state law in the course and scope of their duties and/or functions as agents, employees, and/or officers of the City and/or the NYPD.

15. At the times relevant herein, Defendants Lt. Roe, Sgt. Sinner, P.O. Toribio, P.O. Germain, and Does violated clearly established rights and standards under the Fourth and Fourteenth Amendments to the United States Constitution and under equivalent New York State constitutional provisions, of which reasonable police officers in their respective circumstances would have known.

## STATEMENT OF FACTS

16. At approximately 3:15 a.m. on April 23, 2017, Mr. Azurdia took a taxi from the Bronx, New York, to his home in Brooklyn.

17. When the taxi arrived at his apartment building, Mr. Azurdia realized he did not have the funds to pay the taxi fare on his person.

18. Mr. Azurdia and the taxi driver agreed that Mr. Azurdia would go to his apartment to get the funds to pay his fare and that the taxi driver would hold Mr. Azurdia's New York City Identification Card as collateral while he did so.

19. The New York City identification card Mr. Azurdia gave the taxi driver as collateral was valid, contained a picture accurately depicting Mr. Azurdia, accurately listed Mr. Azurdia's home address, and listed the name and telephone number of his wife, Ms. Chibbaro, as his emergency contact.

20. Mr. Azurdia went to his apartment to retrieve the money.

21. Ms. Chibbaro was asleep inside the apartment at the time.

22. Mr. Azurdia was in the process of getting the money in the apartment when he dozed off.

23. Approximately twenty minutes after Mr. Azurdia had entered his apartment building, the taxi driver called 911.

24. The taxi driver told the 911 operator that he had driven a person from the Bronx to Brooklyn; that the person had provided his identification and said they would return with money in five minutes; that twenty minutes had passed without the person returning; and that he thought something might be wrong.

25. The taxi driver informed the 911 operator that the person's identification was valid and accurately listed his building and apartment numbers.

26. Mr. Azurdia was subsequently awoken by knocking at his apartment door.

27. The people outside his apartment door did not identify themselves.

28. Mr. Azurdia believed that the person knocking was a friend who had been staying with him and his wife and went to answer the door.

29. As he did so, he was followed by his dog, Lola, who came to Mr. Azurdia's side as he reached the front door.

30. Mr. Azurdia opened his apartment door.

31. Lola did not bark or lunge at the police officers.

32. Lola did not act in an aggressive or threatening manner or act in a manner that could reasonably have been believed to be aggressive or threatening.

33. P.O. Germain, unreasonably and without justification, fired his gun at Lola several times.

34. Mr. Azurdia dropped to the floor in shock.

35. Lola was struck several times by the bullets shot from P.O. Germain's gun.

36. Lola yelped and limped away from the police officers.

37. Mr. Azurdia saw Lola whimpering and bleeding profusely.

38. Mr. Azurdia screamed, "You shot my dog!" and began to cry.

39. Ms. Chibbaro ran from her bedroom to the apartment entrance as soon as she heard the gunshots being fired.

40. Ms. Chibbaro saw her husband lying on the ground and blood on the floor.

41. Ms. Chibbaro saw Lola whimpering and bleeding in the hall.

42. Ms. Chibbaro screamed, "Did you shoot my dog?"

43. Lola struggled to get to Mr. Azurdia and Ms. Chibbaro.

44. One of the Defendant Police Officers yelled, "Hold it!" referring to Lola, "Keep that thing away from me!"

45. Ms. Chibbaro exclaimed, "What are you doing here?"

46. Ms. Chibbaro implored Defendants P.O. Toribio and P.O. Germain to take Lola to a veterinarian.

47. Defendants P.O. Toribio and P.O. Germain did not make any attempt to get Lola medical attention.

48. Defendants P.O. Toribio or P.O. Germain used their police radio to request that a supervisor respond to the scene.

49. Defendants P.O. Toribio or P.O. Germain showed Mr. Azurdia's New York City Identification card to Ms. Chibbaro and asked her if Mr. Azurdia was her husband.

50. Ms. Chibbaro responded that Mr. Azurdia was her husband.

51. One of the police officers told Ms. Chibbaro that Mr. Azurdia had not paid for a taxi.

52. People in the building came into the hallway outside Plaintiffs' apartment to see what had happened.

53. Additional police officers showed up at Plaintiffs' apartment, including Lt. Roe and Sgt. Sinner.

54. When Lt. Roe and Sgt Sinner arrived on the scene, they observed Lola bleeding on the floor, Plaintiffs crying and in distress, and several onlookers trying to see what had happened.

55. Ms. Chibbaro implored police officers to take Lola to a veterinarian.

56. Police officers told Ms. Chibbaro to "calm down" and told people in the hallway to go back to their apartments.

57. Eventually, two police officers from the 78th Precinct arrived at the hallway outside Plaintiffs' apartment.

7

58. The two police officers from the 78th Precinct told Ms. Chibbaro that they would take her and Lola to a veterinarian.

59. As they left the apartment building, Ms. Chibbaro saw a taxi which she believed was the taxi that had driven Mr. Azurdia home.

60. Ms. Chibbaro asked the detectives to allow her to pay the taxi driver the money for her husband's taxi fare.

61. The detectives told Ms. Chibbaro to do that later.

62. Ms. Chibbaro subsequently made additional requests to other police officers that she be allowed to pay the taxi driver the money for her husband's taxi fare.

63. The police officers did not permit Ms. Chibbaro to pay the taxi fare.

64. Unbeknownst to Plaintiffs, the taxi driver made several requests to police officers that Mr. Azurdia be permitted to pay the taxi fare that was owed to him.

65. Police officers falsely told the taxi driver that they could not do anything about the outstanding taxi fare.

66. Police officers falsely and deceitfully implied that Mr. Azurdia was refusing to pay the taxi fare by telling the taxi driver that they could not "force" Mr. Azurdia to give him money.

67. The police officers from the 78th Precinct took Ms. Chibbaro and Lola to the Blue Pearl veterinary hospital in Brooklyn.

68. Other police officers took Mr. Azurdia from his apartment to a stairwell at the end of the hallway where they surrounded him.

69. Upon information and belief, while Mr. Azurdia was being detained, Defendants P.O. Toribio and P.O. Germain informed Lt. Roe and Sgt. Sinner of the events that led up P.O. Germain shooting Plaintiffs' dog.

70. Upon information and belief, Lt. Roe and Sgt. Sinner recognized P.O. Germain's unjustifiable shooting of Plaintiffs' dog would reflect poorly upon themselves, as supervisors, and upon the police department in general.

71. Upon information and belief, Defendants P.O. Toribio and P.O. Germain informed Lt. Roe and Sgt. Sinner that, after driving him home, the taxi driver had arranged to hold Mr. Azurdia's identification card as collateral until Mr. Azurdia got money from his apartment to pay his taxi fare,

72. Upon information and belief, Defendants Lt. Roe, Sgt. Sinner, P.O. Toribio, and P.O. Germain were aware that the identification card Mr. Azurdia provided to the taxi driver as collateral was valid and accurate.

73. Upon information and belief, Defendants P.O. Toribio and P.O. Germain informed Lt. Roe and Sgt. Sinner that the taxi driver had called 911 when Mr. Azurdia had failed to return after approximately twenty minutes.

74. Upon information and belief, Defendants Lt. Roe, Sgt. Sinner, P.O. Toribio, and P.O. Germain understood that the taxi driver did not call 911 to have Mr. Azurdia arrested but because he thought something might have happened to Mr. Azurdia.

75. Upon information and belief, Defendants Lt. Roe, Sgt. Sinner, P.O. Toribio, and P.O. Germain understood that the taxi driver only wanted Mr. Azurdia to pay his taxi fare and did not want Mr. Azurdia to be arrested.

76. Upon information and belief, Defendants Lt. Roe, Sgt. Sinner, P.O. Toribio, and P.O. Germain were aware that the taxi driver was requesting that Mr. Azurdia be permitted to pay his taxi fare.

77. Upon information and belief, Defendants Lt. Roe, Sgt. Sinner, P.O. Toribio, and P.O. Germain were aware that Plaintiffs had requested that they be permitted to pay the taxi fare.

78. Upon information and belief, despite their knowledge of the aforementioned facts, Defendants Lt. Roe, Sgt. Sinner, P.O. Toribio, and P.O. Germain agreed to arrest Mr. Azurdia and bring false criminal charges against him.

79. Upon information and belief, Lt. Roe and Sgt. Sinner agreed to have Mr. Azurdia arrested on false charges to portray him as a criminal and cover up P.O. Germain's misconduct in unjustifiably shooting Plaintiffs' dog.

80. Mr. Azurdia was placed in handcuffs.

81. Mr. Azurdia was eventually taken in handcuffs to the 77th Precinct.

82. Doctors at the Blue Pearl veterinary hospital tried to stabilize Lola and assess her injuries.

83. The doctors determined that Lola had been shot three times: one bullet went through her snout, another bullet had gone into her torso and was lodged in her lung, and another bullet had grazed one of her legs.

84. When doctors tried to remove the bullet from Lola's lung, Lola's heart stopped beating.

85. The doctors were unable to resuscitate Lola.

86. Lola died because of the gunshot wounds that P.O. Germain had inflicted upon her.

87. While doctors at the Blue Pearl veterinary hospital were trying to save Lola's life, Mr. Azurdia was being processed as a criminal at the 77th Precinct by P.O. Toribio.

88. The Individual Defendants, lacking probable cause and without legal justification, falsely charged Mr. Azurdia with N.Y.P.L § 165.15(6), theft of services for tampering with a fare meter.

89. Mr. Azurdia did not tamper with a fare meter.

90. Mr. Azurdia did not have any intention to obtain taxi transportation without payment of the lawful charge therefor.

91. Mr. Azurdia did not attempt to avoid payment of the lawful charge for such transportation service which had been rendered to him.

92. Mr. Azurdia did not obtain or attempt to obtain such service which had been rendered to him or attempt to avoid payment therefor by force, intimidation, stealth, deception or mechanical tampering, or by unjustifiable failure or refusal to pay.

93. Upon information and belief, the Individual Defendants knew that Mr. Azurdia and the taxi driver had entered into a special agreement for delay in the payment of Mr. Azurdia's taxi fare.

94. Upon information and belief, the Individual Defendants knew that Mr. Azurdia and the taxi driver had agreed that the taxi driver would hold Mr. Azurdia's New York City identification card as collateral until Mr. Azurdia paid his taxi fare.

95. The Individual Defendants knew that Mr. Azurdia's New York City identification card was valid, accurately listed Mr. Azurdia's home address, and also provided the name of his wife and his wife's cell phone number.

96. Upon information and belief, the Individual Defendants knew that the taxi driver had never requested that Mr. Azurdia be arrested.

97. Upon information and belief, the Individual Defendants knew that the taxi driver only requested that Mr. Azurdia pay the taxi fare.

98. Upon information and belief, the Individual Defendants knew that Plaintiffs had attempted to pay Mr. Azurdia's taxi fare, but that they had been prevented from doing so by police officers.

99. P.O. Toribio provided false allegations against Mr. Azurdia to the District Attorney's office, which included a false sworn statement that Mr. Azurdia had "refused to pay" his legal fare to the taxi driver.

100. The accusatory instrument charging Mr. Azurdia with theft of services was based solely on P.O. Toribio's untrue, hearsay allegation that Mr. Azurdia had "refused to pay" his taxi fare.

101. The false charges against Mr. Azurdia were eventually dismissed pursuant to N.Y.C.P.L. § 170.55.

**DAMAGES**

102. The unlawful intentional, willful, deliberately indifferent, reckless, and/or bad faith acts and omissions of the City and Individual Defendants unlawfully violated Mr. Azurdia's and Ms. Chibbaro's Fourth and Fourteenth Amendment rights against unreasonable search and seizures by unreasonably interfering with their possessory interest in their beloved pet dog, Lola. The Individual Defendants' unlawful actions additionally caused Mr. Azurdia to be falsely arrested and imprisoned.

103. As a direct result of Defendants' intentional, bad faith, willful, wanton, reckless,

and/or deliberately indifferent acts and omissions, Plaintiffs sustained injuries and damages, which continue to date and will continue into the future, including: severe mental anguish; emotional distress; severe psychological damage; loss of property; humiliation, indignities and embarrassment, for which Plaintiffs are entitled to monetary relief. Mr. Azurdia additionally suffered loss of freedom for which he is entitled to monetary relief.

104. All the acts and omissions committed by the Defendants described herein for which liability is claimed were done intentionally, unlawfully, maliciously, wantonly, recklessly, negligently and/or with bad faith, and said acts meet all of the standards for imposition of punitive damages.

## CAUSES OF ACTION

## FEDERAL LAW CLAIMS

### COUNT I
### 42 U.S.C. § 1983 4th and 14th Amendment Unreasonable Seizure
*(Against P.O. Germain)*

105. Plaintiffs hereby incorporate by reference all of the foregoing paragraphs and further alleges as follows:

106. Defendant P.O. Germain deprived Plaintiffs of their clearly established right under the Fourth and Fourteenth Amendments of the United States Constitution to be free from unreasonable seizure of their property.

107. P.O. Germain deprived Plaintiffs of their right to be free from unreasonable seizure of their property by unreasonably shooting and killing Plaintiffs' beloved pet dog, Lola, when Mr. Azurdia opened his apartment door on April 23, 2017.

108. Lola did not present a threat or imminent danger to P.O. Toribio or P.O. Germain, or anyone else, when Mr. Azurdia opened his apartment door. Lola was not acting in an

aggressive or threatening manner, or in a manner that could reasonably be believed to be aggressive or threatening. Lola merely positioned herself next to Mr. Azurdia at the doorway of the apartment.

109. P.O. Germain did not have any legitimate interest, let alone an important government interest, in shooting Plaintiffs' dog, Lola.

110. There is no question as to whether non-lethal methods could have been used to eliminate a threat because there was no threat.

111. P.O. Germain performed the above-described acts under color of state law with reckless disregard and deliberate indifference to Plaintiffs' clearly established constitutional rights. No reasonable police officer in 2017 would have believed this conduct was lawful.

112. As a direct and proximate result of P.O. Germain's actions, Plaintiffs suffered the loss of their beloved pet dog, Lola, and suffered the other grievous and continuing damages and injuries set forth above.

113. The unlawful conduct of Defendant P.O. Germain was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

### COUNT III
### 42 U.S.C. § 1983 14th Amendment Denial of a Fair Trial
### by Fabricating Evidence
*(Against the Individual Defendants)*

114. Plaintiff Diego Azurdia hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

115. The Individual Defendants, acting individually and in concert, deprived Mr. Azurdia of his clearly established constitutional right to a fair trial, under the Fourteenth Amendment of the United States Constitution.

116. The Individual Defendants deprived Mr. Azurdia of his right to a fair trial by

fabricating false evidence that Mr. Azurdia had refused to pay the legal fare to a taxi driver on April 23, 2017.

117. The Individual Defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Mr. Azurdia's clearly established constitutional rights. No reasonable police officer in 2017 would have believed this conduct was lawful.

118. Mr. Azurdia is completely innocent of N.Y.P.L. 165.15, theft of services, by not paying the legal fare to a taxi driver on April 23, 2017. The prosecution against Mr. Azurdia terminated in his favor on September 15, 2017, when the the charges against him were dismissed.

119. As a direct and proximate result of The Individual Defendants' actions, Mr. Azurdia was falsely arrested and imprisoned and suffered the other grievous and continuing damages and injuries set forth above.

120. The unlawful conduct of the Individual Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

## STATE LAW CLAIMS

### COUNT V
### Conversion

121. Plaintiffs hereby incorporate by reference all of the foregoing paragraphs and further alleges as follows:

122. Defendant P.O. Germain intentionally, willfully, wrongfully, and unlawfully interfered with Plaintiffs' property ownership right when he shot and killed their pet dog, Lola.

123. As a result of the foregoing, Plaintiffs suffered pain and suffering, psychological and emotional injury, costs and expenses, and were otherwise damaged and injured.

## COUNT VII
### Negligence

124. Plaintiffs hereby incorporate by reference all of the foregoing paragraphs and further alleges as follows:

125. Defendant City of New York and its agents, servants, and/or employees, including Defendant Jean Germain, owed a duty to the members of the public, including plaintiffs herein, to exercise reasonable care in employing deadly physical force. Specifically, Germain had a duty to not prepare for to use deadly physical force when he had no basis to believe that a potential for serious physical harm existed or that deadly physical force might be justified; to not fire his firearm at a dog when deadly force was not necessary to protect himself or another from physical harm; not to fire his weapon when doing so unnecessarily endangered innocent persons; and not to discharge his firearm at a fleeing subject.

126. Defendant Jean Germain breached this duty by flagrantly violating proper police procedures. Germain breached his duty by, inter alia, by preparing to use deadly physical force when at plaintiffs' apartment door and drawing his firearm when plaintiffs' door opened when Germain had no basis to believe that a potential for serious physical harm existed or that deadly physical force might be justified; by discharging his firearm at Lola when Lola was not acting in an aggressive or threatening manner and deadly force was not necessary to protect himself or another from physical harm; by endangering Mr. Azurdia by discharging his firearm at plaintiffs' apartment door when Mr. Azurdia was in the doorway; and by discharging his firearm at Lola as she fled away from Germain down the hallway.

127. Defendant Gene Germain knew, or should have known, that his aforementioned misconduct in preparing to use deadly force and using deadly force against Lola could cause the death of an innocent animal.

128. As a direct and proximate result of Defendant Gene Germain's negligent acts and omissions, as set forth above, as well as his reckless disregard for life, Lola was killed.

129. By reason of Defendant Gene Germain's negligence, Plaintiffs suffered pain and suffering, psychological and emotional injury, costs and expenses, and were otherwise damaged and injured..

## COUNT IX
### *Respondeat Superior* Claim

130. Plaintiffs hereby incorporate by reference all of the foregoing paragraphs and further alleges as follows:

131. The Individual Defendants, and other individuals who joined with them in their wrongful conduct, were, at all times relevant to this Count, employees and agents of the City of New York. Each of those defendants and persons was acting within the scope of his or her employment, and their acts and omissions, as alleged above, are therefore directly chargeable to the City of New York under the state law doctrine of *respondeat superior.*

**WHEREFORE**, Plaintiffs Diego Azurdia and Marcella Chibbaro pray as follows:

(a) That the Court award compensatory damages to Plaintiffs and against the Defendants, jointly and severally, in an amount to be determined at trial;

(b) That the Court award punitive damages to Plaintiffs against all individual Defendants, in an amount to be determined at trial, that will deter such conduct by Defendants in the future;

(c) For a trial by jury;

(d) For pre-judgment and post-judgment interest and recovery of costs, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 for all 42 U.S.C. § 1983 claims; and

(e) For any and all other relief to which they may be entitled.

Dated: New York, New York

October 2, 2020

/s/Marc A. Cannan
Marc A. Cannan
BELDOCK LEVINE & HOFFMAN LLP
99 Park Avenue, 26th Floor
New York, New York 10016
(212) 490-0400

*Attorneys for Plaintiffs Diego Azurdia
and Marcella Chibbaro*