UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------- X
                                                                     :
DIEGO AZURDIA and MARCELLA CHIBBARO,          :          18-CV-4189 (ARR) (PK)
                                                                     :
                        *Plaintiffs*                           :          NOT FOR ELECTRONIC
                                                                     :          OR PRINT PUBLICATION
        -against-                                            :
                                                                     :
THE CITY OF NEW YORK, a municipal entity;     :          **OPINION & ORDER**
Police Officer BARTY TORIBIO (Shield # 11061);   :
Police Officer JEAN GERMAIN (Shield # 25671);   :
all of whom are sued individually and in their official   :
capacities,                                                :
                                                                     :
                        *Defendants*.                      :
                                                                     :
-------------------------------------------------------------------- X

ROSS, United States District Judge:

Plaintiffs Diego Azurdia and Marcella Chibbaro bring this civil rights action under 42 U.S.C. § 1983 and New York state common law against the City of New York, Police Officer Barty Toribio, and Police Officer Jean Germain. They assert claims of unlawful seizure, denial of right to fair trial, conversion, negligence, and a *respondeat superior* claim against the City for the state law claims. These claims all arise from an incident on April 23, 2017, wherein plaintiffs' dog, Lola, was fatally shot by Officer Germain before he and Officer Toribio arrested Mr. Azurdia for allegedly refusing to pay his taxi fare. Defendants move for summary judgment and plaintiffs oppose. For the reasons set forth below, defendants' motion is denied as to the unreasonable seizure, conversion, and fair trial claims, and denied in part and granted in part as to the negligence claim.

## BACKGROUND

Early in the morning on April 23, 2017, Diego Azurdia took a taxi from the Bronx back to

his apartment near Grand Army Plaza in Brooklyn after a night out.[1] Pls.' Resp. to Defs.' 56.1 and Pls.' 56.1 ("Pls.' 56.1") ¶¶ 1–2, ECF No. 76. When the taxi arrived at Mr. Azurdia's home, Mr. Azurdia discovered he did not have his debit card to pay the fare. *Id.* ¶ 78. He explained the situation to the taxi driver, who agreed to hold Mr. Azurdia's New York City identification card ("NYC ID") as collateral while Mr. Azurdia retrieved money for the fare from his apartment upstairs. *Id.* ¶¶ 79–81; Funes Decl., Ex. A-1 ("Azurdia Dep.") 85:20–22, ECF No. 70-1. Once Mr. Azurdia entered his apartment, however, he fell asleep. Pls.' 56.1 ¶¶ 7–9.

Approximately 20 minutes later, just after 4 a.m., the taxi driver called 911, saying he had not been paid his fare. *Id.* ¶¶ 11–13. Police Officers Germain and Toribio, on patrol in uniform, were dispatched to 36 Plaza Street East to investigate a possible theft of services. *Id.* ¶¶ 14–16. Officer Germain spoke with the taxi driver, who reiterated his complaint and handed over Mr. Azurdia's NYC ID. *Id.* ¶¶ 17–19. The officers buzzed several apartments before gaining access to the building. *Id.* ¶ 84. Officer Germain then knocked on Mr. Azurdia's apartment door. *Id.* ¶ 87. Although Officer Germain had both an asp (baton) and mace spray on his person, he placed his hand on his gun inside his holster as he knocked. *Id.* ¶ 89.

The parties disagree about what happened next. According to plaintiffs, Mr. Azurdia and his wife, Ms. Chibbaro, were awakened by the knocking, but heard no voices outside their door. *Id.* ¶¶ 90, 92. Thinking a friend who had been staying with them had returned, Mr. Azurdia got up and went to the door. *Id.* ¶ 93. His dog, Lola, a 58-pound pit bull mix, followed him, but did not bark or growl. *Id.* ¶¶ 28, 94–95. Mr. Azurdia neither looked through the peephole nor asked who was knocking before opening the door, with Lola at his side. *Id.* ¶¶ 29–30, 96. A fraction of a

---

[1] All undisputed facts are taken from Plaintiff's Rule 56.1 Statement and Plaintiff's Reply to Defendants' Rule 56.1 Statement (collectively "Pls.' 56.1").

second after Mr. Azurdia opened the door, Officer Germain fired his gun in the direction of Lola and plaintiffs' apartment. *Id.* ¶¶ 51, 98. At the time, Lola was not barking, growling, baring her teeth, or charging into the hallway. *Id.* ¶ 99. When Officer Germain fired his gun, Mr. Azurdia dropped to the floor. *Id.* ¶¶ 47, 101. He heard Lola flee into the hallway, whimpering, while the gunshots continued. Pls.' 56.1 ¶¶ 49, 101–02. Officer Germain testified that he fired his gun a total of five times. Funes Decl., Ex. E ("Germain Dep.") 64:7–19, ECF No. 70-6. Mr. Azurdia was then placed under arrest while Ms. Chibbaro took Lola to the vet. Pls.' 56.1 ¶ 60; Azurdia Dep. 132:6–16. While the timeline is unclear, plaintiffs appear to allege that when Ms. Chibbaro returned, she asked a police officer if she could pay Mr. Azurdia's taxi fare; she was ignored. *See* Cannan Decl., Ex. 5 ("Chibbaro Dep.") 112:7–25; Pls.' 56.1 ¶ 107. Lola died of her injuries shortly after arriving at the vet. Pls.' 56.1 ¶ 58. An autopsy revealed Lola had been shot in the muzzle, chest, and rear limbs. *Id.* ¶ 104.

By contrast, defendants say Officer Germain, with Officer Toribio by his side, knocked on Mr. Azurdia's door, loudly announced himself as police, and heard barking and growling inside. Defs.' 56.1 ¶¶ 22–24, ECF No. 72. Officer Germain warned Mr. Azurdia to secure his dog and repeated this warning as he heard footsteps nearing the door. *Id.* ¶¶ 24–26. When the door opened, Lola charged out—barking, growling, and baring her teeth—heading straight for Officer Germain. *Id.* ¶¶ 33, 36–38. Officer Germain started firing seconds after the door opened, when Lola was approximately two feet away, to protect himself and Officer Toribio. *Id.* ¶¶ 42–43. He stopped firing when Lola ran away, towards the stairwell. *Id.* ¶¶ 50, 53.

Plaintiffs cite to interviews with other residents of 36 Plaza Street East conducted by police after the shooting. Some were awakened by their apartment buzzers, then subsequently heard the gunshots. Some were awakened by the gunshots. After the gunshots, some heard a woman yelling, "You shot my dog!" and/or crying, and one person heard a dog yelping. Nobody—including

plaintiffs' downstairs neighbor—reported hearing loud knocking, a voice yelling "police," "hold the dog," or "secure the dog," or a dog loudly barking and growling. Pls.' 56.1 ¶¶ 118–22.

Parties agree that at approximately 5:50 a.m., Mr. Azurdia was placed under arrest for theft of services and transported to the 77th Precinct for processing. *Id.* ¶¶ 60–61; Funes Decl., Ex. G ("Arrest Report"), ECF No. 70-8. Officer Toribio testified that he filled out Mr. Azurdia's arrest paperwork and spoke to the Assistant District Attorney ("ADA") about that paperwork. Funes Decl., Ex. D ("Toribio Dep.") 81:25–82:11, 90:5–15, ECF No. 70-5. Officer Toribio also testified that he did not remember the specific details of that conversation. *Id.* at 87:14–18. The ADA prepared a criminal complaint against Mr. Azurdia for theft of services under N.Y.P.L. § 165.15, which Officer Toribio signed and swore to. *Id.* at 87:19–89:17; Defs.' 56.1 ¶¶ 65–66; Funes Decl., Ex. H ("Criminal Compl."), ECF No. 70-9. The criminal complaint states that Mr. Azurdia refused to pay his taxi fare, an element of theft of services. *Id.*

Mr. Azurdia was released from the precinct at approximately 1 p.m. the same day. Funes Decl., Ex. B ("Azurdia 50-h Hr'g") 21:19–25, ECF No. 70-3; Azurdia Dep. 148:17–24. At his arraignment, Mr. Azurdia accepted an adjournment in contemplation of dismissal ("ACD").[2] Pls.' 56.1 ¶ 67. Mr. Azurdia's ACD included a requirement to complete community service and bring the proof of completion to the court, which he did. Azurdia Dep. 149:13–24. Mr. Azurdia's charges were officially dismissed on September 15, 2017. Funes Decl., Ex. I ("Certificate of Disposition"), ECF No. 70-10.

---

[2] An adjournment in contemplation of dismissal is "an adjournment of the action without date ordered with a view to ultimate dismissal of the accusatory instrument in furtherance of justice." In cases like Mr. Azurdia's, the prosecutor has six months to ask the court to restore the case to the calendar "upon a determination that dismissal of the accusatory instrument would not be in furtherance of justice." If the prosecution does not do so within six months, the case is "deemed to have been dismissed by the court in furtherance of justice." N.Y. Crim. Proc. Law § 170.55.

On July 23, 2018, Mr. Azurdia and Ms. Chibbaro filed a § 1983 lawsuit against defendants in the U.S. District Court for the Eastern District of New York, asserting several claims for the injuries they suffered as a result of Lola's fatal shooting and Mr. Azurdia's arrest and prosecution. Compl., ECF No. 1. Plaintiffs' Third Amended Complaint asserts four causes of action: Fourth Amendment and Fourteenth Amendment unreasonable seizure, Fourteenth Amendment denial of the right to a fair trial, common law conversion, and common law negligence. Third Am. Compl. ¶¶ 105–31 ("TAC"), ECF No. 62. Plaintiffs also assert a *respondeat superior* claim against the City. *Id.* Defendants now move for summary judgment on all claims. ECF Nos. 69–71.

## LEGAL STANDARD

A district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The function of the court is not to resolve disputed issues but rather to determine whether there is a genuine issue to be tried. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is material if it "might affect the outcome of the suit." *Id.* at 248. The moving party carries the burden of demonstrating that there is no genuine dispute respecting any material fact and "may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1223–24 (2d Cir. 1994). If the moving party meets its burden, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citation omitted). Rather, it "must offer some hard evidence showing that its version of the events is not wholly fanciful." *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998).

In assessing whether summary judgment is appropriate, I consider "the pleadings, depositions, answers to interrogatories and admissions on file, together with any other firsthand

information including but not limited to affidavits." *Nnebe v. Daus*, 644 F.3d 147, 156 (2d Cir. 2011) (quoting *In re Bennett Funding Grp., Inc.*, 336 F.3d 94, 99 (2d Cir. 2003)); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In reviewing the record before me, I am "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *McLee v. Chrysler Corp.*, 109 F.3d 130, 134 (2d Cir. 1997).

## DISCUSSION

### I.   Summary Judgment on the Unreasonable Seizure Claim is Denied.

As detailed in my order on defendants' motion to dismiss, ECF No. 27, the Second Circuit and several other circuits agree that "the unreasonable killing of a companion animal constitutes an unconstitutional 'seizure' of personal property under the Fourth Amendment." *Carroll v. Cnty. of Monroe*, 712 F.3d 649, 651 (2d Cir. 2013) (citing cases). Where, as here, a seizure is made without a warrant, it is "presumptively unreasonable." *Branson v. Price*, No. 13-CV-3090 (REB), 2015 WL 5562174, at *5 (D. Colo. Sept. 21, 2015) (citing *United States v. Place*, 462 U.S. 696, 701 (1983)). A warrantless seizure may nevertheless be reasonable if "the totality of the circumstances justified [the] particular sort of . . . seizure." *Carroll*, 712 F.3d at 651 (alteration in original) (quoting *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985)). In conducting this analysis, courts utilize a balancing test, comparing "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests" implicated by the particular situation. *Garner*, 471 U.S. at 8 (quoting *Place*, 462 U.S. at 703). The reasonableness inquiry "is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989). An officer's actions are not to be judged "with the 20/20 vision of hindsight," *id.* at 396, and the "analysis allow[s] for the fact that police officers are often forced to make split-second judgments—in circumstances that

are tense, uncertain, and rapidly evolving," *Brown v. Battle Creek Police Dep't*, 844 F.3d 556, 567 (6th Cir. 2016) (alteration in original) (quoting *Robinson v. Pezzat*, 818 F.3d 1, 8 (D.C. Cir. 2016)).

In the context of the fatal shooting of a pet, there are several specific considerations that the court must keep in mind. First, it is well-established that the killing of a pet dog constitutes "a severe intrusion given the emotional attachment between a dog and an owner." *Carroll*, 712 F.3d at 651; *see also Altman v. City of High Point*, 330 F.3d 194, 205 (4th Cir. 2003) ("Dogs have aptly been labeled 'Man's Best Friend,' and certainly the bond between a dog owner and his pet can be strong and enduring."). On the other side of the scale, however, is a "significant" governmental interest: dogs may represent a serious risk to the safety of officers and the general public. In some circumstances, it may be "reasonable for an officer to shoot a dog that he believes poses a threat to his safety or the safety of the community." *Carroll*, 712 F.3d at 651. In particular, "the state's interest in protecting life and property may be implicated when there is reason to believe [a] pet poses an imminent danger." *Brown v. Muhlenberg Twp.*, 269 F.3d 205, 210 (3d Cir. 2001). If it was reasonable for the officer to believe that danger was imminent, a fatal seizure may be justified even if the dog did not actually pose a danger to the officer. *See Dziekan v. Gaynor*, 376 F. Supp. 2d 267, 272 (D. Conn. 2005) ("[T]he law does not require the officer to wait until the approaching animal is within biting distance or is leaping at him before taking protective action." (citation omitted)).

Plaintiffs argue that Officer Germain's fatal shooting of Lola deprived them of their right under the Fourth and Fourteenth Amendments "to be free from unreasonable seizure of their property." TAC ¶ 106. Defendant Officer Germain moves for summary judgment on this claim, arguing that plaintiffs bear the burden of proving an unreasonable seizure and that plaintiffs have failed to do so here. Defs.' Mot. Summ. J. 5 ("Defs.' Mot."), ECF No. 71. Defendants' arguments are unavailing. Plaintiffs, the non-moving parties, have satisfied their burden of establishing

violation of their Fourth Amendment rights, and defendants have failed to establish that a jury could only conclude that Officer Germain's shooting of Lola was reasonable. Nor is Officer Germain entitled to qualified immunity at this stage in the litigation.

### A. Genuine issues of material fact preclude summary judgment for Officer Germain.

I conclude that there are several genuine issues of fact material to the reasonableness of Officer Germain's shooting Lola, which preclude summary judgment on plaintiffs' Fourth Amendment unreasonable seizure claim. The facts disputed between the parties include: whether Lola was barking and growling before Mr. Azurdia opened the door, *compare* Defs.' 56.1 ¶¶ 22, 24 *with* Pls.' 56.1 ¶ 95; whether Officer Germain warned Mr. Azurdia to restrain Lola, *compare* Defs.' 56.1 ¶ 25 *with* Pls.' 56.1 ¶ 92; whether Officer Germain announced the presence of police, *compare* Defs.' 56.1 ¶ 23 *with* Pls.' 56.1 ¶ 88, 92; whether Lola barked, growled, showed her teeth, and lunged while approaching Officer Germain, *compare* Defs.' 56.1 ¶ 38 *with* Pls.' 56.1 ¶ 99; how quickly Lola approached Officer Germain, *compare* Defs.' 56.1 ¶ 37 *with* Pls.' 56.1¶ 99; Lola's location relative to the apartment and Officer Germain when Officer Germain started firing his gun, *compare* Defs.' 56.1 ¶¶ 21, 32–34, 42–44 *with* Pls.' 56.1 ¶ 98; whether there was room in the hallway for Officer Germain to move away from Lola, *compare* Defs.' 56.1 ¶¶ 21, 32, 34 *with* Pls.' 56.1 ¶¶ 21, 32, 34; whether Officer Germain continued firing as Lola ran away from him, *compare* Defs.' 56.1 at ¶¶ 49–50, 53 *with* Pls.' 56.1 ¶¶ 101–02; how many gunshots struck Lola, *compare* Defs.' 56.1 ¶ 52 *with* Pls.' 56.1 ¶ 103. Each of these factual disputes bears on whether Officer Germain's decision to open fire was objectively reasonable, and each presents a genuine dispute of fact.

Nor can I grant summary judgment for the defendants based purely on the undisputed facts. Parties agree that (1) on the day of the incident, Lola was approximately 60 pounds and was at least part pit bull, Defs.' 56.1 ¶ 28; Pls.' 56.1 ¶ 28; (2) Officer Germain fired at least three shots at

Lola, Defs.' 56.1 ¶ 52; Pls.' 56.1 ¶ 52; (3) everything happened in a matter of seconds, Defs.' 56.1 ¶ 51; Pls.' 56.1 ¶ 51. Examining the undisputed facts alone, it is entirely possible that a reasonable jury could find Officer Germain acted unreasonably in shooting Lola. An approach by a large dog is not inherently dangerous without more information. *See Strong v. Perrone*, 2020 WL 1445877, at *4 ("A dog approaching an officer, without some sign of aggression, is … insufficient." (citing *Azurdia*, 2019 WL 1406647, at *8)). While Lola's pit bull heritage may be relevant to the Fourth Amendment analysis, *see, e.g.*, *Branson*, 2015 WL 5562174, at *5 (listing "[t]he breed of the dog" as one of the factors to be considered as part of the "totality of the circumstances"), a breed's reputation for aggression does not, on its own, justify a fatal shooting, *see id.* at *6 ("Even though[] [the defendant] reasonably perceived the dog to be a dangerous breed, that fact alone does not justify a seizure in the form of shooting the dog."). An officer confronted by a dog whose breed is "known for fighting, aggressive behavior," *Niesen v. Garcia*, No. 14-CV-2921 (WBS) , 2016 WL 4126382, at *9 (E.D. Cal. July 5, 2016), has a right to remain on guard, but the dog's presence during an arrest does not itself give an officer license to seize it, *see Shimburski v. McCarthy*, No. 17-CV-699S (WMS), 2020 WL 5653298, at *8 (W.D.N.Y. Sept. 23, 2020) ("[T]he breed of the dog by itself does not make a 'shoot first and ask questions later' technique reasonable." (citation omitted)).

Incorporating the disputed facts construed in the light most favorable to plaintiffs, it is even clearer that a jury could find Officer Germain acted unreasonably in shooting Lola. According to plaintiffs, Lola did not bark or growl before Mr. Azurdia opened the door. Pls.' 56.1 ¶ 95. Officer Germain did not announce a police presence or warn Mr. Azurdia to restrain Lola. *Id.* ¶¶ 23, 25, 88, 92. Lola did not bark, growl, or bare her teeth at Officer Germain. *Id.* ¶ 99. The door had barely opened when Officer Germain started firing at Lola. *Id.* ¶ 98. Officer Germain continued firing at Lola as she ran away down the hallway. *Id.* ¶ 102.

The reasonableness of Officer Germain's shooting of Lola is a factual question for a jury. I therefore deny defendant's motion for summary judgment on the unreasonable seizure claim.

### B.  Officer Germain is not entitled to qualified immunity at this stage.

"A government official is entitled to immunity from suit whenever (1) his conduct did not violate clearly established law, or (2) it was objectively reasonable for the official to believe that his action did not violate such law." *Naumovski v. Norris*, 934 F.3d 200, 210 (2d Cir. 2019); *see also Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) ("The doctrine of qualified immunity shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."). To be clearly established, the right must be defined with reasonable specificity and "particularized" to the facts of the case. *Naumovski*, 934 F.3d at 211 (citing *White v. Pauly*, 137 S. Ct. 548, 552 (2017)). Put differently, precedent must have recognized the right under similar circumstances such that a reasonable defendant would have understood that their acts were unlawful. *Id.* Government officials are shielded from liability if their actions were based on reasonable mistakes of law or fact. *Id.* at 210.

"Where there is no dispute as to the relevant facts, the applicability of qualified immunity is a question of law for the court to decide." *Robinson*, 2017 WL 2414811, at *6. Qualified immunity is appropriate at summary judgment "where the only conclusion a rational jury could reach is that reasonable officers would disagree about the legality of the defendant's conduct under the circumstances." *Cugini v. City of New York*, 941 F.3d 604, 615 (2d Cir. 2019) (citation and quotation marks omitted).

At the time of Lola's death, the law clearly established that the fatal seizure of a pet by a government employee without justification constitutes a Fourth Amendment violation. *See Carroll*, 712 F.3d at 651. This right was defined with reasonable specificity in the Second Circuit.

*Id.* at 652 (highlighting the totality of the circumstances analysis as to whether the dog was dangerously aggressive and whether there were viable non-lethal alternatives).

Determining whether a reasonable officer would have understood preexisting law to prohibit shooting Lola under the circumstances, however, necessitates resolving genuine disputes of material fact, which is not appropriate at summary judgment. Construing the disputed facts in plaintiffs' favor, a reasonable officer would have understood preexisting law to prohibit shooting Lola under the circumstances. In *Carroll*, the Second Circuit case most similar to the case here, the police shooting of a dog was deemed unreasonable as the officers were executing no-knock warrants and had no room to move. *Id.* at 650. However, *Carroll* also cites cases from other courts of appeal where a police shooting of a dog while approaching or entering a home was unreasonable where "the officers had ample time to utilize non-lethal means" to subdue the dog "without compromising their safety." *Id.* at 651–52 (citing, *inter alia*, *San Jose Charter of Hells Angels Motorcycle Club v. City of San Jose*, 402 F.2d 962, 965, 975–78 (9th Cir. 2005); *Erwin v. Cnty. of Manitowoc*, 872 F.2d 1292, 1299–1300 (7th Cir. 1989)). These latter cases are more similar to Plaintiffs' narrative here. Officer Germain's rebuttal in favor of qualified immunity rests almost entirely on his version of disputed facts, Defs.' Mot. 11–12 (emphasizing "the potential harm posed by an unrestrained 63 pound pit bull dog advancing towards him baring its teeth, growling and barking, and lunging at him all at a distance of a couple of feet in a narrowly confined hallway"), which I cannot credit at summary judgment.

Whether the law clearly prohibited Officer Germain's conduct depends on the particular circumstances before him, which are disputed between the parties. Thus, summary judgment on qualified immunity is not appropriate here.

## II.     Summary Judgment on the Conversion Claim is Denied.

For largely the same reasons, I deny defendant Germain's motion for summary judgment on plaintiffs' conversion claim, which is based on the same facts that give rise to plaintiffs' unreasonable seizure claim.

Plaintiffs allege a conversion claim against Officer Germain. TAC ¶¶ 121–23. New York law requires a plaintiff to prove conversion by demonstrating "(1) a possessory right or interest in the property and (2) defendant's dominion over the property or interference with it, in derogation of plaintiff's rights." *Frederique v. Cnty. of Nassau*, 168 F. Supp. 3d 455, 485 (E.D.N.Y. 2016) (citation omitted).

Officer Germain acknowledges that plaintiffs have demonstrated both elements,[3] but alleges the shooting was justified by self-defense. Self-defense is an appropriate affirmative defense to conversion. *See Nat'l Liab. & Fire Ins. Co. v. Rick's Marine Corp.*, 268 F. Supp. 3d 371, 376 (E.D.N.Y. 2017) (acknowledging that "public and private necessity" are "recognized justifications in conversion" (quoting 2A N.Y. Pattern Jury Instructions 3:10 at p. 122 (2017))); Restatement (Second) of Torts §222A(2)(c) (Am. Law Inst. 1965) (including "the actor's good faith" in asserting control over a chattel as a factor in determining the seriousness of the interference). However, the facts underlying the conversion claim are disputed. The genuine disputes of material fact relevant to the reasonableness of Officer Germain's seizure of Lola (*e.g.*, whether Lola was barking and growling before and after the door opened, how Lola approached Officer Germain, and when Officer Germain started shooting) also bear on whether Officer Germain was justified in shooting Lola in self-defense. *See* Discussion I, *supra*.

Therefore, for the same reasons discussed above, I conclude that a reasonable jury could

---

[3] Defendants acknowledge that plaintiffs have demonstrated 1) plaintiffs have a possessory right or interest in their pet dog; and 2) Officer Germain shot their dog, thereby exercising dominion over Lola in derogation of plaintiffs' rights. Defs.' Mot. 19.

find Officer Germain did not have a self-defense justification for shooting Lola.[4] I hereby deny summary judgment on the conversion claim.

### III.     Summary Judgment on the Fair Trial Claim is Denied.

"A plaintiff establishes a denial of fair trial claim when a police officer (1) 'creates false information likely to influence a jury's decision,' (2) 'forwards that information to prosecutors,' and (3) the plaintiff is deprived of [his] liberty as a result." *Buie v. City of New York*, No. 12-CV-4390 (RJD), 2015 WL 6620230, at *9 (E.D.N.Y. Oct. 30, 2015) (emphasis omitted) (quoting *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997)). This constitutional violation occurs the moment the false information is transmitted to prosecutors. *See Ricciuti*, 124 F.3d at 127, 130 (reversing grant of summary judgment to defendants on fair trial claim, where all criminal charges were dismissed before trial, because the falsified evidence had already been transmitted to the prosecutor). Therefore, plaintiff may establish a fair trial claim regardless of whether his criminal proceeding concluded in a trial. *Manigault v. City of New York*, No. 11-CV-4307 (AJN), 2012 WL 13049173, at *6 (S.D.N.Y. Apr. 19, 2012). A plaintiff alleging a fair trial claim must also demonstrate that the criminal proceeding underlying the claim has terminated in his or her favor. *McDonough v. Smith*, 139 S. Ct. 2149, 2155–56 (2019); *Smalls v. Collins*, 10 F.4th 117, 139 (2d Cir. 2021).

Mr. Azurdia alleges that defendant Officer Toribio[5] interfered with his Fourteenth Amendment right to a fair trial by falsely stating to the prosecutor that Mr. Azurdia refused to pay

---

[4] Since plaintiffs' state law conversion claim survives, the City may be held liable under the doctrine of *respondeat superior*. Neither party disputes this issue. Therefore, defendants' motion for summary judgment on plaintiffs' claim against the City of New York is denied.

[5] While plaintiffs' Third Amended Complaint named both Officer Germain and Officer Toribio, TAC ¶¶ 114–20, Mr. Azurdia withdrew his fair trial claim against Officer Germain during summary judgment briefing, Pls.' Opp'n Mot. Summ. J. ("Pls.' Opp'n") 12, ECF No. 71. The fair trial claim against Officer Germain is therefore dismissed.

his taxi fare and that this evidence led to Mr. Azurdia being arrested, detained, and charged with theft of services in violation of N.Y. Penal Law § 165.15. TAC ¶¶ 115–19.

Officer Toribio moves for summary judgment on two grounds:[6] first, that there is no evidence in the record that Officer Toribio provided any false information in the paperwork supporting Mr. Azurdia's prosecution; and second, that "Mr. Azurdia cannot establish [that] he suffered a deprivation of liberty in support of his denial of right to fair trial claim" because, as his criminal proceeding ended in an ACD, Mr. Azurdia lacks the favorable termination element of a fair trial claim. Defs' Br. 13–14. Both responses fail as a matter of law.

### A. There are genuine issues of material fact as to whether Officer Toribio fabricated evidence and forwarded it on to the prosecutor.

Turning to defendant's first argument—that the record discloses no evidence that Officer Toribio fabricated information—I find that plaintiffs have set forth ample evidence permitting a jury to conclude that Officer Toribio did, in fact, falsely tell the prosecutor that Mr. Azurdia had refused to pay the taxi driver.

As to the falsity of the statement, Mr. Azurdia twice testified that he did not *refuse* to pay his cab fare; rather, he unintentionally failed to pay by falling asleep before he could retrieve money for the fare. *See* Azurdia Dep. 83:21–84:13; 89:14–90:16; 143:9–16. Mr. Azurdia's version of events is sufficiently supported by further facts to which he testified: he handed the taxi driver a valid piece of identification with his address and told the driver he would be back shortly with money for the fare. *Id.* at 83:25–85:25.

---

[6] Defendants also assert that other evidence shows Mr. Azurdia did not pay his fare, "thus supporting the arrest and related charges for theft of services." Defs.' Mot. 13. This argument in effect urges that there was probable cause to arrest and charge Mr. Azurdia, therefore insulating defendants from a fair trial claim. Probable cause is not, however, a defense to a fair trial claim. *See Ricciuti*, 124 F.3d at 130 ("No arrest, no matter how lawful or objectively reasonable, gives an arresting officer or his fellow officers license to deliberately manufacture false evidence against an arrestee.").

As to whether the record suffices to show that Officer Toribio told the ADA that Mr. Azurdia's actions were intentional, Officer Toribio testified that he prepared Mr. Azurdia's arrest paperwork and spoke with the ADA about that paperwork. Funes Decl., Ex. D ("Toribio Dep.") 81:25–82:18, 90:5–8, ECF No. 70-5. Although Officer Toribio testified that he cannot *now* remember what he said to the ADA, he attested that when he communicated with the ADA, he understood he had an obligation to tell the ADA his reasons for arresting Mr. Azurdia. *Id.* at 89:18– 90:15, 92:21–93:11, 95:24–96:5. Finally, Officer Toribio testified that he signed the criminal complaint, an act that included attesting to the veracity of the information it set forth. *Id.* at 87:19– 89:17, 90:12–25; *see also* Funes Decl., Ex. H ("Criminal Compl."), ECF No. 70-9. The sworn complaint alleges, *inter alia*, that Mr. Azurdia refused to pay the cab fare. *See* Criminal Compl.

The above provides ample (and unrebutted) evidence to support Mr. Azurdia's claim that Officer Toribio relayed to prosecutors that Mr. Azurdia refused to pay his cab fare, a statement that, at this juncture, we presume to be false.

### B. There are genuine issues of material fact as to whether plaintiff suffered a deprivation of liberty as a result of Officer Toribio's fabricating evidence.

While the third element, deprivation of liberty, was never addressed by the parties, courts in the Second Circuit have found similar or lesser deprivations than that experienced by Mr. Azurdia to satisfy the standard. To establish this element, a plaintiff must show that he "suffered a 'deprivation of liberty that was "not too remote" a consequence of the act of creating the false information. *Baksh v. City of New York*, No. 15-CV-7065 (NGG), 2018 WL 1701940, at *9 (E.D.N.Y. Mar. 31, 2018) (quoting *Collins v. City of New York*, No. 14-CV-8815 (AJN), 2018 WL 1596190, at *13 (S.D.N.Y. Mar. 29, 2018)). Plaintiff must show the fabricated evidence caused some further deprivation beyond the arrest. *See Ganek v. Leibowitz*, 874 F.3d 73, 91 (2d Cir. 2017); *Ross v. City of New York*, No. 17-CV-3505 (PKC), 2019 WL 4805147, at *9 (E.D.N.Y. Sept. 30,

2019); *Rowell v. City of New York*, No. 16-CV-6598 (AJN), 2019 WL 280469, at *2 (S.D.N.Y. Jan. 22, 2019). Courts have identified further deprivations to include, "the setting of bail, . . . the prosecutor's decision to pursue charges rather than dismiss the complaint . . . , the number of court appearances a plaintiff made post-arraignment, and constraints such as bail requirements, a period of incarceration, or travel restrictions." *Ross*, 2019 WL 4805147, at *9 (citations and quotation marks omitted). Fabricated evidence can cause such a deprivation because "[t]hese decisions 'may depend on the prosecutor's and magistrate's assessments of the strength of the case, which in turn may be critically influenced by fabricated evidence.'" *Id.* (quoting *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 277 (2d Cir. 2016)).

It is true that courts in this circuit find any single factor insufficient to establish a deprivation of liberty. *See, e.g.*, *Burg v. Gosselin*, 591 F.3d 95, 101 (2d Cir. 2010) (holding that a pre-arrangment, non-felony summons requiring no more than a later court appearance does not, by itself, constitute a deprivation of liberty); *Randolph v. Metro. Transp. Auth.*, No. 17-CV-1433 (DLC), 2018 WL 2943744, at *7 (S.D.N.Y. June 12, 2018) (finding a single court appearance insufficient for a fair trial claim where the plaintiff was never "detained in a jail or precinct"). Here, by contrast, multiple factors together establish that Mr. Azurdia suffered a deprivation of liberty. Mr. Azurdia was detained at the precinct for approximately 7 hours, from approximately 6 a.m. to 1 p.m. He was then required to appear in court for his arraignment, where he received his ACD. Mr. Azurdia's ACD mandated that he complete a day of community service and bring proof of completion to the court. Moreover, once a court has issued an ACD, the defendant is released on his own recognizance, a condition that restricts defendant's movements for the six-month period before the case is dismissed. *See* N.Y. Crim. Proc. § 170.55(2) (requiring release on own recognizance after issuance of ACD); N.Y. Crim. Proc. § 510.40 ("Upon ordering that a principal

16

be released on the principal's own recognizance . . . the court must direct the principal to appear in the criminal action or proceeding involved whenever the principal's attendance may be required and to be at all times amenable to the orders and processes of the court."); *see also Rohman v. N.Y.C. Transit Auth.*, 215 F.3d 208, 216 (2d Cir. 2000) (holding that under Section 510.40, an arrestee released on his own recognizance "must ordinarily remain in the state"); *Perez v. Duran*, 962 F. Supp. 2d 533, 542 (S.D.N.Y. 2013) ("[T]he plaintiff's release on his own recognizance necessarily required the plaintiff to comply with travel restrictions.").

Numerous authorities have found similar facts sufficient to constitute a further deprivation of liberty. *See, e.g.*, *Ross*, 2019 WL 4805147, at *5 n.12 (finding a deprivation of liberty where plaintiff was arrested, detained, and accepted an ACD at her arraignment, with no additional court appearances thereafter); *Gogol v. City of New York*, No. 15-CV-5703 (ER), 2017 WL 3449352, at *11–12 (S.D.N.Y. Aug. 10, 2017) (finding a deprivation of liberty where plaintiff made one post-arraignment court appearance and was subject to travel restrictions under Section 510.40); *Willis v. City of New York*, No. 12-CV-5259 (RA), 2015 WL 556884, at *8 n.9 (S.D.N.Y. Feb. 9, 2015) (finding a sufficient liberty deprivation for summary judgment purposes where the arrestee was out on bail and was required to make one post-arraignment court appearance); *see also Swartz v. Insogna*, 704 F.3d 105, 112 (2d Cir. 2013) ("We have consistently held that a post-arraignment defendant who is 'obligated to appear in court in connection with [criminal] charges whenever his attendance [i]s required' suffers a Fourth Amendment deprivation of liberty." (citation omitted)).

Finally, it is established that two related questions remain: whether Mr. Azurdia's deprivation of liberty was proximately caused by the allegedly fabricated evidence, and whether the fabricated evidence would likely have swayed a jury. *See Garnett*, 838 F.3d at 279–80. These inferences are for the jury. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("[T]he

weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."); *see also, e.g.*, *Ross*, 2019 WL 4805147, at *9 (holding that "a reasonable jury could infer . . . that Plaintiff . . . could have been released without agreeing to an ACD" had the false statement not been made to prosecutors).

### C.  Mr. Azurdia has established that his criminal proceeding terminated in his favor.

The final, most recently established element of a fair trial claim requires a plaintiff to show that the underlying criminal case terminated in plaintiff's favor. The Second Circuit recently held in *Smalls* that an ACD is a favorable termination that allows a fair trial claim to accrue. 10 F.4th at 144. The ACD thus presents no bar to suit.

### D.  Officer Toribio is not entitled to qualified immunity at this stage.

The same factual issues described immediately above, *see* Discussion III.A *supra*, also preclude granting qualified immunity at this time.

I therefore deny summary judgment as to Mr. Azurdia's fair trial claim.

## IV.  Summary Judgment on the Negligence Claim is Granted in Part and Denied in Part.[7]

Plaintiffs assert a negligence claim against defendant Officer Germain, arguing that Officer Germain breached his duty toward plaintiffs by negligently shooting and killing Lola in a manner contrary to proper police procedures. TAC ¶¶ 125–28. More specifically, plaintiffs allege Officer Germain breached his duty by (1) preparing to use his firearm despite having "no basis to believe that a potential for serious physical harm existed or that deadly physical force might be justified"; (2) discharging his firearm at Lola when Lola did not pose a threat; (3) "endangering Mr. Azurdia

---

[7] Because plaintiffs' negligence claim survives in part, the claim against the City of New York for *respondeat superior* also survives. *See* n.4, *supra*.

by discharging his firearm at plaintiffs' apartment door when Mr. Azurdia was in the doorway";

and (4) discharging his firearm at Lola as she fled away from him and down the hallway. *Id.* ¶ 126.

Plaintiffs therefore appear to be alleging a negligence claim regarding physical injuries to Lola,

and a separate negligence claim regarding emotional injuries to Mr. Azurdia.

Officer Germain responds by asserting two arguments. First, he contends that there is no

evidence in the record supporting a finding that his conduct was negligent, inadvertent, or a

mistake. Defs.' Mot. 20. Second, he argues that a negligence claim cannot be based on a deviation

from the New York Police Department ("NYPD") Patrol Guide, because (i) a deviation of the

NYPD Patrol Guide is not *per se* negligence, and (ii) the Guide does not limit officers to non-lethal

alternatives to fend off a dangerous animal. *Id.* at 21.

### A. Summary judgment is granted on the negligence claim as regards Officer Germain's shooting of Lola.

Plaintiffs assert that Officer Germain's negligent acts led to the killing of Lola. But the

facts in the record only support the conclusion that Officer Germain *intentionally* shot Lola. The

materials contain no allegations that Officer Germain was, for example, aiming elsewhere or

accidentally discharged his gun. A negligence claim cannot be based entirely on intentional

conduct. *See Bah v. City of New York*, No. 13-CV-6690 (PKC), 2014 WL 1760063, at *13 (S.D.N.Y.

May 1, 2014) (internal citation omitted) ("Though litigants may allege alternate, or inconsistent,

claims in a pleading, when the conduct alleged, if true, may only give rise to liability for an

intentional act, a claim of negligence may be dismissed."); *Oliver v. Cuttler*, 968 F. Supp. 83, 92

(E.D.N.Y. 1997) ("[O]nce intentional offensive contact has been established, the actor is liable for

assault and not negligence, even when the physical injuries may have been inflicted inadvertently."

(quoting *Mazzaferro v. Albany Motel Enters., Inc.*, 515 N.Y.S.2d 631, 632–33 (1st Dep't 1987))).

Plaintiffs seek to support their negligence cause of action by citation to *McCummings v. N.Y.C. Transit Auth.*, 580 N.Y.S.2d 931 (1st Dep't 1992), *aff'd*, 597 N.Y.S.2d 653 (1993), and *Lubecki v. City of New York*, 758 N.Y.S.2d 610 (1st Dep't 2003). These cases are inapposite on this point, however, because in each, the plaintiff asserted negligent, not intentional, conduct. In *McCummings*, the only claim submitted to the jury (and thus at issue on appeal) was a negligence claim. 597 N.Y.S.2d at 654. Therefore, the jury's analysis of the Transit Authority's internal rules governing use of deadly force was for the negligent use of deadly force. *See* 580 N.Y.S.2d at 934–35. *Lubecki* similarly involved an accidental killing due to negligent shooting in contravention of NYPD Patrol Guide protocol. 758 N.Y.S.2d at 617–18.

I therefore grant summary judgment on the negligence claim to the extent the claim is based on injuries to Lola.

### B. Summary judgment is denied on the negligence claim as regards Officer Germain's discharging a weapon near Mr. Azurdia.

The negligence claim partially survives because plaintiff has sufficiently adduced facts that support a negligence claim regarding injuries to Mr. Azurdia. While plaintiffs describe their claim as sounding in negligence, their briefing establishes instead the elements of a related, but distinct claim: negligent infliction of emotional distress. *Compare Dzwonczyk v. Syracuse City Police Dep't*, 710 F. Supp. 2d 248, 278 (N.D.N.Y. 2008) ("In New York, in order to establish a claim of negligence, Plaintiff must prove . . . he suffered a physical injury as a result of … Defendants' action or inaction.") *with Ewing v. Roslyn High Sch.*, No. 05-CV-1276 (JS), 2009 WL 10705995, at *6 (E.D.N.Y. Mar. 31, 2009) ("[W]here a plaintiff suffers only emotional or mental injury and there is no pain and suffering stemming from a physical injury or condition, the plaintiff's cause of action is for negligent infliction of emotional harm and not for pure negligence.").

Under New York law, a plaintiff may establish a claim for negligent infliction of emotional

distress when, *inter alia*, he or she suffers an emotional injury directly resulting from a breach of a duty by defendant that unreasonably endangered plaintiff's own physical safety. *Mortise v. United States*, 102 F.3d 693, 696 (2d Cir. 1996) (citing, *inter alia*, *Kennedy v. McKesson Co.*, 462 N.Y.S.2d 421, 423 (1983)). To recover, a plaintiff must have been in the zone of danger of physical impact, *i.e.*, was "placed in immediate risk of physical harm," as a result of a defendant's negligence. *Conrail v. Gottshall*, 512 U.S. 532, 547–48 (1994) (citing, *inter alia*, *Bovsun v. Sanperi*, 473 N.Y.S.2d 357 (1984)).

The standard of care owed by police officers to those in the zone of danger when using deadly force is the common law standard of reasonable care. *See Lubecki*, 758 N.Y.S.2d at 617–18; *Smith v. City of New York*, 12-CV-4922 (NRB), 2015 WL 4643125, at *3 (S.D.N.Y. Aug. 5, 2015) ("[W]here a statute offers a police officer the privilege to commit what would normally be considered a battery, the police officer must exercise reasonable care in exercising his discretion."). Police guidelines are informative, though not dispositive, in determining whether an officer exercised reasonable care. *See McCummings*, 580 N.Y.S.2d at 934–35 (rejecting appellate challenge to jury's consideration at trial of Transit Authority regulations regarding use of deadly force); *cf. Lubecki*, 758 N.Y.S.2d at 617 (consulting patrol guide but warning, "these departmental manuals do not impose a higher duty of care than . . . for common-law negligence").

Whether Officer Germain breached this duty of care when discharging his weapon depends on the same factual questions reserved for the jury above. *See* Discussion I and II, *supra*. In the record, plaintiffs have sufficiently adduced facts supporting a finding of breach to survive summary judgment. Mr. Azurdia testified that when he opened his apartment door, Lola was by his side and Officer Germain started shooting as soon as the door opened, meaning the bullets passed very near to Mr. Azurdia. That Mr. Azurdia feared for his physical safety is confirmed by his testimony that he dropped to the floor when he heard the shots. Azurdia Dep. 129:10–12.

Whether Officer Germain nevertheless was reasonable in shooting at Lola given plaintiff's location remains a disputed issue of fact at this juncture; it cannot be resolved short of trial.

Plaintiffs have also sufficiently established facts supporting emotional injuries directly resulting from the shooting to survive summary judgment. Mr. Azurdia testified that he spent the month following Lola's death "unable to do anything else, other than just the very basic things of day-to-day life," and lost at least ten pounds due to an inability to eat. *Id.* at 150:13–20, 152:14–18. He was subsequently diagnosed with "very acute" PTSD and trauma, for which he received treatment. *Id.* at 152:4–5, 153:17–154:21. Mr. Azurdia also testified that the "nonsensical violence" of the incident "shatter[ed his] world" and left him "absolutely terrified of NYPD." *Id.* at 150:14–23. He cited a night where his in-law knocked on his bedroom door and he "started screaming from fright." *Id.* at 151:5–7.

Therefore, I deny summary judgment on the negligence claim to the extent the claim is based on injuries to Mr. Azurdia resulting from him being in the zone of danger when Officer Germain shot Lola.

## CONCLUSION

For the foregoing reasons, I deny defendants' motion for summary judgment on plaintiffs' claims for unreasonable seizure, conversion, denial of right to fair trial, and negligence as to Mr. Azurdia's injuries. I grant defendants' motion on the negligence claim as to Lola's injuries.

SO ORDERED.

_____/s/_____

Allyne R. Ross
United States District Judge

Dated:          September 30, 2021
                Brooklyn, New York

22